NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0036n.06

No. 21-3115

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**
Jan 24, 2022
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| STEVEN ADAY, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE |
| WESTFIELD INSURANCE CO.; OHIO FARMERS | ) | SOUTHERN DISTRICT OF |
| INSURANCE CO., | ) | OHIO |
| | ) | |
| Defendants-Appellees. | ) | |

BEFORE: DAUGHTREY, COLE, and CLAY, Circuit Judges.

**CLAY, Circuit Judge**. Plaintiff Steven Aday filed suit against Defendants Westfield Insurance Company and Ohio Farmers Insurance Company alleging failure-to-hire age discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq*., and Ohio law, O.R.C. Chapter 4112, and retaliation under O.R.C. § 4112.02. He also alleged Defendants' counterclaims were filed in bad-faith, which would entitle him to attorney's fees under 18 U.S.C. § 1836(b)(3)(D). The district court granted Defendants' motion for summary judgment disposing of all his claims. Plaintiff then filed a motion to alter or amend the judgment, which the district court denied. For the reasons set forth below, we reverse the district court's grant of summary judgment on Plaintiff's age discrimination claims and affirm the district court's grant of summary judgment on Plaintiff's retaliation claim, finding of no bad faith, and denial of Plaintiff's motion to alter the judgment.

**I.**

**A. Factual Background**

In July 2005, Westfield Insurance Company ("Westfield"), a subsidiary of Ohio Farmers Insurance Company ("Ohio Farmers," collectively "Defendants"), hired Plaintiff as an insurance claims specialist at its Blue Ash, Ohio office. Prior to joining Westfield, Plaintiff had gained approximately 28 years of experience in the insurance industry, including 12 years in leadership roles. For approximately the first five years of his career at Westfield, Plaintiff specialized in handling construction defect claims. Then, in 2010, he was promoted to the position of Auto Unit Leader in the Auto Division where he remained for six years. As Auto Unit Leader, Plaintiff managed a team of claim representatives and he consistently received outstanding performance reviews from his supervisors and direct reports.

In July 2016, Plaintiff transferred out of his leadership role as Auto Unit Leader to become a litigation claims specialist. Although he no longer had direct reports, Westfield did not necessarily consider this a demotion. In fact, Westfield regularly rotated its employees through different positions. As a litigation claims specialist, Plaintiff handled a wide variety of claims in the areas of premises liability, construction defects, transportation and cargo, copyright infringement, advertising injury, employment practices liability, employee benefits liability, premises and operations, products liability, completed operations, and motor vehicle accidents.

In April 2017, when he was 63 years old, Plaintiff notified Defendants he would be moving to Seattle, Washington because his domestic partner, Moira Tamayo, had accepted an executive-level position in the city. Plaintiff made clear that he wanted to remain employed with Westfield, preferably working remotely in his litigation claims specialist role. At that time, Plaintiff's

workload was primarily based in Ohio and Kentucky. Defendants denied his request to work remotely, but allowed him to remain in the position in Cincinnati as long as he wished.

Over the following months, Plaintiff searched for any position at Westfield that could support remote work from Seattle. In fact, Plaintiff's direct supervisor, Betsy Jones, tried to help him obtain a remote position. Jones was not the only supervisor who allegedly advocated on Plaintiff's behalf. Jodie Hopkins, Jones' second-level manager, and Robert Bowers, Westfield's National Claims Leader, also advocated on Plaintiff's behalf. The parties dispute the degree to which Jones, Hopkins, and Bowers actually supported Plaintiff's future with Westfield, but at a minimum, they agree the three had conversations about him. On one occasion, at a private funeral for a Westfield employee, Bowers brought up Plaintiff's future with Westfield with at least two employees. Upon the encouragement of Jones, Hopkins, Bowers, and others, Plaintiff applied formally and informally to several positions.

In July 2017, Sheila Lilly, Westfield's Casualty Injury / General Liability Leader, posted an announcement stating the company was looking for candidates to fill two vacancies for Unit Leader roles in her department. One position would be located in the "Mid-west and east," and the other would be "in the Western states," with direct reports in Minnesota, Arizona, Colorado, and Illinois. (Job Description, R. 41-7, Page ID # 357.)

Aware of the problems his move to Seattle had been for other positions for which he applied, Plaintiff contacted Lilly before submitting his application to see if the Unit Leader positions were even an option. Lilly encouraged him to apply but advised Plaintiff to "sell us on how you can make this work. . . . At the same time, leadership is talking about how we need leaders in an office more often." (Lilly Email, July 17, 2017, R. 41-9, Page ID # 361.) Plaintiff applied and was one of fourteen applicants invited for an interview.

On August 8, 2017, Plaintiff interviewed with Lilly and another manager, Jason Bidinger. Plaintiff brought with him a travel calendar and flight information detailing how he would travel to the positions' direct reports. The map showed the airfare costs from Seattle to the respective offices of the direct reports, which demonstrated that the cost of air travel from Seattle to these locations was no more expensive than traveling from Cincinnati. At the end of the interview, Lilly and Bidinger told Plaintiff he had "hit it out of the park." (Lilly Dep., R. 49, Page ID # 906). Bidinger even told Plaintiff at the end of his interview, "[y]ou're the one to beat." (*Id.*, Page ID # 892). Lilly agreed.

After interviewing the applicants, Lilly and the various other managers who assisted her with the 14 interviews conducted a "draft room" to discuss the pros and cons of each applicant. That process narrowed the decision to the top four candidates, which included Plaintiff. Draft room participants noted that Plaintiff had "wide experiences" and that he was the "most plug [and] play – ready to go." (Draft Room Notes, R. 49-3, Page ID # 942.) During the draft room, managers cited as a "con" his location and proposal to fly to his direct reports three times per month. Additionally, they expressed uncertainty whether Plaintiff actually wanted the Unit Leader position or any position in which he could work remotely. Despite feeling his interview went well, on or about August 31, 2017, Lilly notified Plaintiff that he did not get the job and shared that 45-year-old Danielle Somogyi and 50-year-old Curt Zito had accepted the two positions.

Besides Plaintiff, Somogyi and Zito were two of the top candidates. Somogyi had joined Ohio Farmers in 1994 and had been in an executive-level leadership role for 11 years. Zito began working at Ohio Farmers two years earlier in 2015. Prior to joining Ohio Farmers, he had gained over 20 years of experience in the insurance industry. Lilly had initially hired Zito and he was one

of her direct reports until she transferred to the Casualty Injury / General Liability Unit Leader position shortly before these events occurred.

On or about September 14, 2017, Plaintiff spoke with Terry Neumeyer, a complex claims analyst at Westfield's home office. Neumeyer was not Plaintiff's supervisor, nor was he involved in any hiring decisions. During their conversation, Plaintiff alleges Neumeyer stated he had spoken with one or more managers about their decision not to hire Plaintiff and he said, "[e]veryone thinks it's time for you to put up your piggies, relax, and let . . . your wife be the breadwinner, you've earned it." (Aday Dep., R. 41, Page ID # 294; EEOC Compl., R. 41-13, Page ID # 476 ("According to Mr. Neumeyer, one of the managers even expressly stated that it was time for me to 'put up [my] piggies' and 'let [my] wife be the breadwinner.'"); Neumeyer Dep., R. 51, Page ID ## 1033–34. ("I said that he could sit back and put up his piggies.").)

On or about September 18, 2017, after learning that he had not been offered either Unit Leader position, Plaintiff gave up looking for a new job within the company and submitted his irrevocable request for retirement. He officially retired on October 31, 2017 and moved to Seattle.

## B. Procedural Background

On February 12, 2018, Plaintiff filed a lawsuit in Ohio state court against Westfield alleging failure-to-hire and failure-to-retain age discrimination. On February 20, 2018, Plaintiff filed an Equal Employment Opportunity Commission ("EEOC") Charge. On May 15, 2017, the EEOC closed Plaintiff's claim and permitted him to file suit in federal court. Plaintiff dismissed his state-court suit and filed a lawsuit against Westfield in the District Court for the Southern District of Ohio on June 8, 2018, alleging age discrimination under the federal Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*, and Ohio law, O.R.C. Chapter 4112.

Under both statutes, he alleged failure-to-hire and failure-to-retain discrimination claims. He subsequently amended his Complaint to add Ohio Farmers as a party.

Shortly after Plaintiff commenced this action in federal court, he disclosed to Defendants that in the course of his employment, he had emailed work files to his personal email account so he could work from home. Defendants audited Plaintiff's Westfield email account and uncovered several email messages in which Plaintiff sent proprietary information to his personal account and one email to his domestic partner, Tamayo.

On August 28, 2018, the district court granted Defendants leave to file counterclaims. They counterclaimed that Plaintiff misappropriated trade secrets in violation of the federal Defend Trade Secrets Act, 18 U.S.C. § 1831, *et seq.*, and the Ohio Uniform Trade Secrets Act, O.R.C. § 1333.61, *et seq.*, by emailing Defendants' proprietary information to himself and Tamayo. Plaintiff then amended his complaint to add a retaliation claim.

At the close of discovery, the parties both moved for summary judgment: Defendants on Plaintiff's age discrimination and retaliation claims, and Plaintiff on Defendants' misappropriation-of-trade-secrets claims. Plaintiff also alleged the counterclaims were filed in bad faith and thus he was entitled to attorney's fees. *See* 18 U.S.C. § 1836(b)(3)(D). The district court granted both motions for summary judgment but held Defendants' counterclaims were not filed in bad faith. Plaintiff then filed a motion to alter the judgment seeking reconsideration of his age discrimination claims, retaliation claim, and finding that the counterclaims were not filed in bad faith. The district court denied Plaintiff's motion. Plaintiff timely filed a Notice of Appeal, and only challenges the district court's grant of summary judgment on his failure-to-hire age

discrimination claim related to the Unit Leader position under both federal and Ohio law[1], its grant of summary judgment on his retaliation claim under Ohio law, its finding Defendants' counterclaims were not filed in bad faith, and its denial of his motion to alter the judgment.

## II.

### A. ADEA Claims

This Court reviews summary judgment rulings *de novo*. *Est. of Romain v. City of Grosse Pointe Farms*, 935 F.3d 485, 490 (6th Cir. 2019). Summary judgment is only appropriate where the movant has shown "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(c). A "factual dispute is genuine if it is based on evidence that a reasonable jury could use to return a verdict for the nonmoving party." *Est. of Romain*, 935 F.3d at 490 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In evaluating a summary judgment motion, the court is not "to weigh the evidence and determine the truth of the matter" but rather must "determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249. The Court must construe the evidence in the record and all inferences to be drawn from it in the light most favorable to the non-movant. *Kraus v. Sobel Corrugated Containers, Inc.*, 915 F.2d 227, 231 (6th Cir. 1990).

The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation,

---

[1] Because Ohio courts look to federal anti-discrimination statutes when interpreting their own, Plaintiff's federal and state-law claims can be analyzed together. *Plumbers & Steamfitters Joint Apprenticeship Comm'n v. Ohio Civil Rights Comm'n*, 421 N.E.2d 128, 131 (Ohio 1981); *Romano v. Hudson City Sch. Dist.*, 772 F. App'x 258, 264 (6th Cir. 2019) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 357 (6th Cir. 1998)) ("Ohio has its own age discrimination statute, but 'the elements and burden of proof in [an Ohio] state age-discrimination claim parallel the ADEA analysis.'. . . Therefore, we need not consider Ohio law separately.").

terms, conditions, or privileges of employment, because of an individual's age." 29 U.S.C. § 623(a)(1). A plaintiff establishes a violation of the ADEA by proving by a preponderance of the evidence "that age was the 'but-for' cause of the challenged employer decision." *Flowers v. WestRock Servs., Inc.*, 979 F.3d 1127, 1130 (6th Cir. 2020) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–78 (2009)). An employee may use either direct or circumstantial evidence to satisfy this burden of proof. *Id.* Evidence of discrimination is direct when, "if believed, [it] requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions. . . . Circumstantial evidence, on the other hand, is proof that does not on its face establish discriminatory animus but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (en banc) (quotation marks omitted).

When a plaintiff's claim of age discrimination is based solely on circumstantial evidence, this Court proceeds under the three-step *McDonnell Douglas* burden-shifting framework. *George v. Youngstown State Univ.*, 966 F.3d 446, 459 (6th Cir. 2020) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Under this framework, the plaintiff alleging an ADEA violation bears "the initial burden of establishing a prima facie case of discrimination." *Flowers*, 979 F.3d at 1130. If the plaintiff satisfies this initial burden, the employer then bears the burden of articulating some "legitimate, non-discriminatory reason" for the alleged discriminatory action. *Id.* Finally, if the employer can articulate some non-discriminatory reason, the burden shifts back to the plaintiff, who now must prove that the reason provided "is not the true reason for the employment decision," *id.*, and instead the reason "was pretext designed to mask discrimination," *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 812 (6th Cir. 2011). Under this framework, only the burden of production shifts: "At all times, the ultimate burden of persuasion remains on the

plaintiff to demonstrate that age was the 'but-for' cause of their employer's adverse action." *Flowers*, 979 F.3d at 1130.

### 1. Prima Facie Case

A prima facie case of age discrimination requires a plaintiff to prove: "(1) he was at least 40 years old at the time of the alleged discrimination; (2) he was subjected to an adverse employment action; (3) he was otherwise qualified for the position; and (4) he was replaced by a younger worker." *George*, 966 F.3d at 464. Here, Defendants concede that Plaintiff has satisfied his burden of proving by a preponderance of the evidence a prima facie case of age discrimination.

### 2. Articulation of Legitimate, Nondiscriminatory Reason

Having satisfied his initial burden, the *McDonnell Douglas* framework then shifts the burden of production onto Defendants to articulate a legitimate, nondiscriminatory reason for failing to hire Plaintiff. *Flowers*, 979 F.3d at 1130. Regarding the Unit Leader positions, Defendants argued to the district court that the "decision to place more value on the qualifications and experience of other candidates were legitimate, nondiscriminatory reasons for not hiring Aday." (Defs.' Mot. for Summ. J., R. 59, Page ID # 1486.) This Court will not second-guess a non-discriminatory reason "even if the [the employer's] hiring process was entirely subjective." *Browning v. Dep't of Army*, 436 F.3d 692, 698 (6th Cir. 2006). Consequently, Defendants have satisfied their burden of articulating a legitimate non-discriminatory reason.

### 3. Pretext

The final step in the *McDonnell Douglas* burden-shifting framework, and the step the parties focus on the most, is whether the employer's nondiscriminatory reasons for not hiring Plaintiff are pretextual. To prove pretext under the *McDonnell Douglas* burden-shifting

framework, a plaintiff can demonstrate discriminatory motive or "cast[] doubt on the defendant[s']" asserted nondiscriminatory basis." *George*, 966 F.3d at 465. To survive summary judgment, Plaintiff need only proffer enough evidence from which a reasonable jury could reject Defendants' articulated reasons. *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020) (quoting *Chen v. Dow Chemical Co.*, 580 F.3d 394 (6th Cir. 2009) (internal quotation marks omitted).

In most ADEA contexts, "[a] plaintiff can refute the legitimate, nondiscriminatory reason that an employer offers to justify an adverse employment action by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Provenzano*, 663 F.3d at 815 (quotation marks omitted). Additionally, in a failure-to-hire claim such as this, Plaintiff may prove pretext through the relative-qualifications test. *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 627 (6th Cir. 2006). To survive summary judgment under the relative-qualifications test, he must present evidence demonstrating that either (1) he was the "plainly superior candidate, such that no reasonable employer would have chosen the latter applicant over the former," or (2) he "was as qualified as if not better qualified" than Somogyi and Zito and the record contains "other probative evidence of discrimination." *Id.; see also Provenzano*, 663 F.3d at 815. Plaintiff argues the district court erred by failing to recognize a genuine dispute of material fact under both prongs of the relative-qualifications test and more broadly under the general pretext test.

### i. Plainly Superior Candidate

Plaintiff can survive summary judgment if he proves he "was [the] plainly superior candidate, such that no reasonable employer would have chosen" Somogyi or Zito over him. *Id*. To prove that he was the plainly superior candidate, Plaintiff "must objectively demonstrate his

superior qualifications." *Artis v. Finishing Brands Holdings, Inc.*, 639 F. App'x 313, 320 (6th Cir. 2016) (citing *Provenzano*, 663 F.3d at 806). "If two reasonable decisionmakers could consider the candidates' qualifications and arrive at opposite conclusions as to who is more qualified, then clearly one candidate's qualifications are not significantly better than the others." *Bender*, 455 F.3d at 628 (citations omitted). In determining whether Plaintiff was the plainly superior candidate, the Court must avoid "acting as a 'super personnel department,' overseeing and second-guessing employers' business decisions." *Id.*

The Sixth Circuit has created an exceptionally high standard for satisfying the burden of proving a plaintiff is the plainly superior candidate. For example, in *Bartlett v. Gates*, 421 F. App'x 485, 488–91. (6th Cir. 2010), plaintiff-Bartlett challenged his employer's hiring of another candidate, Lucas, claiming he was the plainly superior candidate. The Court found that

> Plaintiff had 24 years of experience as a contract administrator, compared to Lucas's eight years of experience. In addition, Plaintiff possessed superior educational credentials, including a bachelor's degree and advanced course work in areas relevant to the job, whereas Lucas had not graduated from college. Record evidence also suggests that Plaintiff's communication skills. . . were satisfactory if not superior to Lucas's own. . . . Plaintiff also had substantially more experience and familiarity in the area of contract negotiations, which was said to be a "critical function" of the position.

*Id.* at 491. Despite these disparities, the Court "[found] that while Plaintiff may not have been a 'plainly superior candidate' . . . , Plaintiff was as qualified if not more qualified than Lucas." *Id.* Thus, to survive a motion for summary judgment based on the plainly-superior prong of the relative qualifications test, a plaintiff must proffer a significant amount of evidence demonstrating his superior qualifications. Simply being "more qualified" is not sufficient to prove Plaintiff is the plainly superior candidate. *Id.*

With this backdrop in mind, Plaintiff raises three arguments that he believes demonstrate he is the plainly superior candidate. First, he argues his technical experience was superior. Second, he argues he had superior leadership experience. And finally, he argues he was uniquely qualified for the position "in the Western states."[2]

Plaintiff first argues that he was the plainly superior candidate because Somogyi and Zito did not have the same level of technical experience. Defendants respond that technical experience was not an important criterion for the Unit Leader position and even if it were, Somogyi and Zito had "at least equivalent experience handling the same type of claims as Aday." (Appellees' Br. 23.)

The job description for the Unit Leader position supports Plaintiff's argument that technical experience was important to the role. Under the "Job Summary" section of the Unit Leader job posting, Defendants stated the successful applicant "[p]rovides leadership for casualty claim professionals and is responsible for operational success of assigned casualty claims unit. Responsible for technical guidance, quality and customer service related to casualty claims."

---

[2] Plaintiff also makes a passing argument that he had the best interview among the three applicants and therefore he is the plainly superior candidate. To support this argument, he points to comments made by Lilly and other interviewers, such as he "came prepared to the interview," was "loaded for the bear," was the "one to beat," that he "hit it out of the park," (Lilly Dep., R. 49, Page ID ## 879, 892, 895, 906), and that he was the "most plug [and] play – ready to go" of the candidates, (Draft Room Notes, R. 49-3, Page ID # 942).

This argument is unavailing for two reasons. First, despite these positive remarks, the record indicates Plaintiff's interview was not as perfect as he claims. Lilly admitted to having reservations about his plan to travel to visit his direct reports. The fact she believed he had given a great presentation, and told him so, does not invalidate her concerns about his travel plans. Second, even if the Court draws all inferences favorable to Plaintiff, the result only leads to the conclusion that he had a better interview. While being a good interviewee is a boon for any job applicant, it does not "objectively demonstrate his superior qualifications" for the Unit Leaders positions. *Artis*, 639 F. App'x at 320.

(Job Description, R. 41-8, Page ID # 358.)   The job description goes on to list the "Desired

Qualifications / Experience / Certification / Education (in order of importance)" as:

1.  5 or more years of casualty claims handling experience of accurately evaluating, negotiating, and settling commercial casualty claims.
2.  Previous casualty claims handling experience with exposure up to $150,000.
3.  3 or more years of successful leadership experience with increased responsibility. . . .

(*Id*., Page ID # 359.)  Notably, Defendants listed technical experience (i.e, casualty claims handling

experience) as the two most important qualifications.  Defendants argue these are merely "desired

qualifications" and that "casualty claims" are not necessarily the same as "technical experience."

(Appellees' Br. 22.)  While this may be true, Plaintiff has proffered enough evidence to at least

suggest that technical experience was a relevant criterion for the Unit Leader position.

Nevertheless, even assuming technical experience was relevant, Plaintiff has not proffered

enough evidence to convince a reasonable juror his technical experience was so superior to

Somogyi's and Zito's experience that he was the plainly superior candidate.  Plaintiff certainly had

broad exposure to Defendants' business and handled many types of claims in his career.  According

to Plaintiff, he handled claims including slip-and-falls, construction defects, discrimination, motor

vehicle accidents, and construction bonding.  In fact, his breadth of experience was confirmed in

the draft room notes, which specifically mention his prior experience as a "pro."  Lilly even

admitted that Plaintiff had experience handling a "very diverse" set of claims during his 12-year

career.  (Lilly Dep., R. 49, Page ID # 915.)  On the other hand, Zito stated that during his time with

Westfield, he had worked primarily on slip-and-fall claims and motor vehicle accidents, and

Somogyi had experience working on structured settlements in workers' compensation cases, motor

vehicle accidents, and slip-and-fall claims.

Plaintiff also points to the fact that Somogyi and Zito underwent online training to prove they lacked his level of technical experience. However, both Somogyi and Zito stated these courses were taken as part of maintaining their licensure. The fact that Somogyi and Zito chose to take their required courses on topics related to their new positions hardly suggests they were significantly less qualified for the position than Plaintiff. Nevertheless, at the summary judgment stage, the Court is not to weigh the credibility of the parties' evidence and instead should infer in Plaintiff's favor that Somogyi and Zito took the courses to learn their new fields. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

After construing all inferences in favor of Plaintiff and looking at the facts in the light most favorable to him, a jury could conclude that he had slightly better technical experience than Somogyi or Zito. However, even if Plaintiff were considered the candidate with marginally better technical experience, no reasonable juror could conclude he was the plainly superior candidate under the Sixth Circuit's exacting standard, especially considering technical experience is only one facet of the job.

Plaintiff next argues that he was the plainly superior candidate because he had more leadership experience than Somogyi and Zito. Plaintiff has again failed to raise a genuine dispute of material fact. Regarding Somogyi, Plaintiff merely claims Lilly did not mention her leadership experience when explaining why she chose Somogyi over him. Regarding Zito, he argues the district court improperly relied on Zito's pre-Westfield leadership roles because the court did not consider Plaintiff's own pre-Westfield career. Moreover, Plaintiff claims any pre-Westfield work experience is of less significance to Defendants' hiring decision than experience gained at Westfield.

Considering Plaintiff's leadership experience first, the evidence paints a mixed picture. Before joining Westfield, Plaintiff gained approximately 12 years of leadership experience in other insurance-related employment. After that, Plaintiff worked for Defendants for 12 years, six years of which were as the Auto Unit Leader. He points out that he always received positive performance evaluations from his direct reports and had a positive reputation throughout the company. Lilly, however, remembers Plaintiff's performance differently. She remembers him seeming overworked and stressed in that role. Further, Lilly cited Plaintiff's decision to leave the Auto Unit Leader position to instead work as a litigation claims specialist as evidence he lacked the desire to be in a leadership role.

Somogyi, on the other hand, had 23 years of experience working at Westfield, 11 of which were in a leadership position. The draft room notes indicate Somogyi's leadership was "incredible." (Draft Room Notes, R. 49-3, Page ID # 943.) As the district court put it, compared to Somogyi, "Plaintiff was the inferior candidate." (Order Denying Mot. Alter J., R. 81, Page ID #1949.) In terms of leadership experience, no reasonable jury could find that Plaintiff was the plainly superior candidate.

Whether Plaintiff or Zito had better leadership experience is a close call, but certainly neither was the plainly superior candidate. Unlike Plaintiff, who had been with Westfield for 12 years, Zito had only been with Westfield for two years. Prior to joining Westfield, Zito gained 17 years of leadership experience. As mentioned above, the Court is not to "act[] as a 'super personnel department,' overseeing and second-guessing employers' business decisions." *Bender*, 455 F.3d at 628. Whether Plaintiff's six years at Westfield and 12 years elsewhere is more or less valuable than Zito's two years at Westfield and 17 years elsewhere is a decision for Defendants to make—not the Court. Instead, the question is simply whether Plaintiff has proffered enough

evidence from which a reasonable juror could conclude he was the plainly superior candidate. He has not.

Plaintiff's final argument is that his relocation to Seattle made him the plainly superior candidate because the position was advertised as being "in the Western states." (Job Description, R. 41-7, Page ID # 357.) In the job posting for the Unit Leader positions, Lilly forecast one would be "in the Western states and one will be more Mid-west and east." (*Id*.) In her personal draft room notes, Lilly expected hiring one Unit Leader "in or around SE states" and the other position "geographically to the West, at least Central time zone." (Draft Room Notes, R. 49-3, Page ID # 941.) The Unit Leader in the West would have direct reports based in Arizona, Colorado, Minnesota, and Illinois.

Plaintiff places great emphasis on the fact that Zito was based in Toledo, Ohio and not in "at least [the] Central time zone." (Draft Room Notes, R. 49-3, Page ID # 941.) However, Plaintiff would be further away from all the direct reports except the one in Arizona, he would be the only employee based in Washington, and anything requiring in-person attendance would incur a greater expense. In fact, from the very beginning, Defendants raised concerns about Plaintiff working off-site. Specifically, Lilly encouraged Plaintiff to apply for the Unit Leader position but qualified her statement by adding, "leadership is talking about how we need leaders in an office more often." (Lilly Email, July 17, 2017, R. 41-9, Page ID # 361.) Thus, while Zito did not meet all the stated requirements for the position, Plaintiff's candidacy was far from perfect. Just as Defendants wanted a Unit Leader in the Central time zone or further west, they also wanted a Unit Leader in an office. Plaintiff has certainly exposed a factual dispute—whether he or Zito was better located for the "in-the-Western-states" position—but he has not produced enough evidence for a reasonable juror to conclude he was the plainly superior candidate.

Finally, even if the Court considers all these arguments collectively, they still fail to establish that Plaintiff was the plainly superior candidate. In his best-case scenario, a reasonable juror could conclude that Plaintiff had marginally better technical training, had better leadership experience than Zito[3], and was in a marginally better geographic location. This is not enough. As the district court correctly held, Plaintiff has not satisfied "the Sixth Circuit's demonstrably high standard." (Order Granting Summ. J., R. 75, Page ID # 1713.)

### ii. As Qualified with Other Probative Evidence

Even though Plaintiff has not proffered enough evidence from which a reasonable juror could find he was the plainly superior candidate, he may still prove pretext under the relative qualifications test by proving (1) he was as qualified as the successful candidates, and (2) the record contains other probative evidence of discrimination. *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 815 (6th Cir. 2011).

Regarding the first element, Plaintiff has certainly proffered enough evidence to convince a jury he was as qualified as Somogyi and Zito. Defendants argue that the predominant qualification for the position was leadership experience and reiterate Somogyi's and Zito's prior experiences. However, as explained above, whether leadership was the main qualification, or merely one of many factors in the decision-making process, is disputed. Additionally, Defendants point to the facts that no one in the draft room thought Plaintiff was one of the top two candidates and his location in Seattle as proof he was not qualified for the Unit Leader position. Surely, Plaintiff's application had shortcomings that Somogyi's and Zito's applications did not (and some strengths Somogyi and Zito did not have), but the question is not whether he was the best

---

[3] Plaintiff has not produced enough evidence from which any reasonable juror could conclude that he had better leadership experience than Somogyi.

candidate. Instead, Plaintiff must merely create a genuine dispute as to whether he was "as qualified" as Somogyi and Zito.

First, Lilly testified that Plaintiff was one of the top four candidates for the position. In fact, Lilly even agreed that Plaintiff had "the necessary qualifications and experience for the job." (Lilly Dep., R. 49, Page ID # 914.) Additionally, she testified how difficult a time she had deciding who to hire among the four, and even her managers noticed how close the candidates' qualifications were. Thus, the district court correctly concluded that Plaintiff has proffered enough evidence from which a jury could conclude he was at least as qualified as Somogyi and Zito.

Having satisfied the first element, the analysis then turns to whether the record contains other probative evidence of discrimination. In assessing the probative value of discriminatory statements, courts consider "the declarant's position in the [employer's] hierarchy, the purpose and content of the statement, and the temporal connection between the statement and the challenged employment action, as well as whether the statement buttresses other evidence of pretext." *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 393 (6th Cir. 2009) (citing *Ercegovich*, 154 F.3d at 356). Plaintiff relies on two comments made by Robert Bowers and Terry Neumeyer. The facts present a remarkably close case, but, drawing all inferences in Plaintiff's favor, we believe he has satisfied his burden.

The first discriminatory comment on which Plaintiff's claim is based was made by Bowers. Bowers was the National Claims and Customer Service Leader at Westfield and Lilly's second-level manager. In fact, only the position of Westfield's chief operating officer separated Bowers' position from that of the chief executive. The district court erroneously found that Bowers was not a decisionmaker in the hiring process for the Unit Leader positions and therefore his comments offered little probative value. Not only do the parties dispute Bowers' decisionmaker status, the

witnesses' depositions explain that Bowers had authority to override Lilly's hiring decision but doing so would be highly unusual. Nevertheless, we need not determine whether Bowers was a decisionmaker because this Court has "held that discriminatory remarks, even by a nondecisionmaker, can serve as probative evidence of pretext." *Risch*, 581 F.3d at 393.

One day during the summer of 2017, shortly after Plaintiff announced his move to Seattle but before he submitted his notice of retirement, Bowers, Plaintiff, and other employees were eating in the Westfield lunchroom.[4] The conversation shifted to who would retire next and Bowers allegedly gestured toward Plaintiff and said, "this one is up." (Aday Dep., R. 41, Page ID # 243.) Plaintiff alleges this comment is probative evidence of discrimination.

Defendants first respond, and Plaintiff has admitted, that Bowers was joking. This Court has held, however, that statements may be probative evidence of discrimination even if they are made as a joke. *Bartlett v. Gates*, 421 F. App'x 485, 491–92 (6th Cir. 2010) (holding comments, including jokes by a decisionmaker, "provide[d] strong 'probative evidence of pretext.'" (citing *Risch*, 581 F.3d at 393)). Thus, even if Defendants are correct in arguing that Bowers was joking when he made this comment, it may still operate as probative evidence of discrimination.

Additionally, in *Ercegovich v. Goodyear Tire & Rubber Co*., 154 F.3d 344, 356 (6th Cir. 1998), we considered whether the plaintiff's managers' comments contributed to a "discriminatory

---

[4] The district court mistakenly found the Bowers' comment took place approximately one year before Plaintiff retired. However, after explaining the lunchroom conversation, Plaintiff testified:

Q. When did that happen?
A. That would have been probably in the summer of 2016.
Q. And you believe that's because of your age?
A. Well, hang on just one second. He -- let me, of '17, excuse me. I apologize. The summer of 2017. Yes, I do believe it was because of my age.

(Aday Dep., R. 41, Page ID ## 243–44.)

atmosphere." We noted that evidence of a discriminatory atmosphere "may serve as circumstantial evidence of individualized discrimination directed at the plaintiff." *Id.* And while a workplace atmosphere replete with discrimination is not conclusive proof that an individual plaintiff is the victim of age discrimination, a discriminatory atmosphere "'tend[s] to add "color" to the employer's decisionmaking processes and to the influences behind the actions taken with respect to the individual plaintiff.'" *Id.* (quoting *Conway v. Electro Switch Corp.*, 825 F.2d 593, 597 (1st Cir. 1987)). Here, Bowers was a very senior leader at Westfield and his willingness to comment on and "joke" about a junior employee's retirement status in the midst of that employee's search for a new position could reasonably be interpreted as contributing to a discriminatory atmosphere at Westfield.

Defendants also claim that any discriminatory animus in his lunchroom comment is negated by the fact Bowers allegedly supported Plaintiff's job search within Westfield. Specifically, Defendants note that Bowers encouraged Plaintiff's candidacy to at least Lilly, Hopkins, and Plaintiff. However, as Plaintiff notes, there are certainly questions of credibility surrounding how zealously Bowers advocated for Plaintiff's future at Westfield. The Court need not address the conflicting accounts of Bowers' commentary on Plaintiff's future with Westfield because it does not affect the analysis. The only authority Defendants offer in support of this argument is *Savage v. Gee*, 665 F.3d 732, 739 (6th Cir. 2012). In *Savage*, the Court considered whether the plaintiff was constructively discharged from his position at a university, which he alleged had created objectively intolerable conditions. *Id.* at 739. The Court held that the plaintiff "had the support of his superiors and, though many members of the faculty were critical of [him], he has failed to show either that conditions were objectively intolerable or that the University intended for him to quit." *Id.* at 740. *Savage* does not consider any form of workplace

discrimination and analyzes the plaintiff's claims under an entirely different framework. Therefore, it provides little persuasive value here. With no authority supporting their argument, Defendants argue the fact that Bowers advocated for Plaintiff's continued employment with Westfield negates any probative value created by his lunchroom comment. In other words, Defendants ask us to rely on a disputed fact to draw an inference against Plaintiff. Such an argument is not persuasive when deciding whether Defendants are entitled to summary judgment.

Besides the comment by Bowers, Plaintiff bolsters his evidence of discrimination by relying on a comment made by Terry Neumeyer. Neumeyer was a complex claims analyst who worked at Westfield's home office with Bowers. Just prior to submitting his notice of retirement, Plaintiff had a conversation with Neumeyer. Plaintiff alleges Neumeyer told him that he spoke to managers about the decision not to hire Plaintiff, and that "everyone thinks it's time for you to put up your piggies." (Aday Dep., R. 41, Page ID # 294; EEOC Compl., R. 41-13, Page ID # 476; Neumeyer Dep., R. 51, Page ID ## 1033–34.) Neumeyer denies having spoken with management regarding the decision not to hire Plaintiff, but admits he told Plaintiff it was time to put up his "piggies."

Defendants do not dispute that Bowers spoke about Plaintiff's future at Westfield to at least, Plaintiff, Lilly, and Hopkins. Adding in Bowers' willingness to "joke" about Plaintiff being the next to retire in front of other employees, a reasonable juror could conclude Plaintiff's recollection of his conversation with Neumeyer was true and that Neumeyer did speak with managers about the decision not to hire him. By themselves, neither Bowers' nor Neumeyer's comment would likely be sufficient to create a genuine dispute. However, considering the comments together, we believe Plaintiff has produced probative evidence of discrimination.

To be clear, a jury may wholly reject Plaintiff's account of these events and find Defendants' evidence more credible. At the summary judgment stage, however, courts are not to weigh the credibility of the parties' evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict."). The question is simply whether the parties have proffered enough evidence to create a genuine dispute, such that a reasonable jury could find in the non-movant's favor. Plaintiff has satisfied his burden.

### iii. General Pretext

Plaintiff next argues Defendants' articulated reasons are pretextual under the general pretext test. For Plaintiff to prove that Defendants' articulated nondiscriminatory explanations are pretextual, he must prove that they "(1) ha[ve] no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) [were] insufficient to warrant the challenged conduct." *Provenzano*, 663 F.3d at 815 (quotation marks omitted). On appeal, the parties only address three bases for pretext: (1) that Plaintiff lacked "passion" for the position, (2) that Somogyi worked on less sophisticated claims, and (3) that Plaintiff proposed a more creative solution for the Unit Leader position than Zito.

Plaintiff first points to Lilly's comments that he lacked passion for the Unit Leader position. Defendants contend that Lilly's statement was not pretextual because Plaintiff did not score "the highest" on a motivational fit assessment and he had applied for both leadership and non-leadership roles causing her to question what position he really desired.

At least three times during her deposition, Lilly testified that Plaintiff did score the highest on a motivational fit assessment, which meant he had "passion for the job." (Lilly Dep., R. 49,

Page ID # 882–84.) She added that Plaintiff "came in very passionate" for his interview. (*Id.*, Page ID # 884.) Although Lilly stated that Plaintiff's decision to move from the Auto Unit Leader position to the litigation specialist position demonstrated he lacked passion, Plaintiff has proffered testimony that such reassignment was considered a lateral move rather than a demotion. Lilly also pointed to the fact that Plaintiff had applied for both leadership and non-leadership positions as support for her contention that he lacked passion. However, she testified that Somogyi's prior position was being terminated and she "applied for everything." (Lilly Dep., R. 49, Page ID # 797.)

Moreover, Plaintiff questions whether "passion" for the Unit Leader position was even a relevant consideration at all. After two decades in the insurance industry, Zito was employed as a property claims adjuster at another insurance company. He spent two years in that position before deciding to leave the insurance industry entirely and became an educator. His stint in education lasted one year before he returned to the insurance industry at Westfield. Thomas Fenlon, Westfield's Claims Quality Assurance Leader, testified that Plaintiff was the only candidate whose "passion" was questioned. Considering all this, a reasonable juror could conclude that Lilly's explanation that Plaintiff lacked passion for the Unit Leader position had no basis in fact and was pretextual.

Plaintiff next challenges Lilly's belief that Somogyi "worked with very high-end, difficult claims." (Lilly Dep., R. 49, Page ID # 838.) This argument can be disposed of easily. Plaintiff claims Somogyi worked predominantly on workers compensation claims and slip-and-fall cases, which were not "very high-end, difficult claims." (Appellant's Br. 45.) Plaintiff provides no evidence to support his claim that workers compensation and slip-and-fall cases are not high-end and difficult. Thus, he has not cast any doubt on Lilly's explanation.

Plaintiff's final argument under the general pretext test is that Zito's plan for the Unit Leader position was not "more creative" than his. (Lilly Dep., R. 49, Page ID # 882.) Lilly stated that she believed Zito presented a "more creative" plan for the position, specifically noting his intention to use "webinars" instead of travelling to his direct reports three times per month. (Lilly Dep., R. 49, Page ID # 931–32.) Plaintiff claims Lilly misunderstood his presentation, that he did not plan to travel three times per month to visit his direct reports, and that the use of technology and "webinars" to connect with the direct reports was not creative. None of these arguments suggest Defendants' decision to hire Zito had no basis in fact. Surely, if Plaintiff gave a presentation that left the hiring manager with the impression he would frequently travel and would rely less on technology than the other candidates, that is either his fault or the fault of the hiring manager's lack of comprehension. In either event, Plaintiff has again not cast any doubt on the veracity of Lilly's explanation.

Plaintiff has cast doubt on some—but not all—of the reasons Defendants articulated for not hiring him. While Lilly's explanation that he lacked passion for the Unit Leader position arguably has no basis in fact, Plaintiff has failed to cast doubt on Lilly's subjective beliefs that Somogyi had more relevant experience and Zito presented a more creative plan. Since these are both nondiscriminatory bases for choosing to hire Somogyi and Zito over Plaintiff, Plaintiff has not created a genuine dispute under the general pretext test.

## B. Retaliation Claim

Plaintiff next alleges that the district court erred in granting Defendants' motion for summary judgment on Plaintiff's retaliation claim. A prima facie case of retaliation under Ohio's age discrimination statute, O.R.C. § 4112.02, requires a plaintiff to prove that "(1) []he engaged in a protected activity, (2) the defending party was aware that the claimant had engaged in that

activity, (3) the defending party took an adverse employment action against the employee, and (4) there is a causal connection between the protected activity and adverse action." *Greer-Burger v. Temesi*, 879 N.E.2d 174, 180 (Ohio 2007). Because the retaliation claim is premised on Defendants' counterclaims, the issue on appeal is whether the filing of such counterclaims is "an adverse employment action against the employee." *Id.*

While "an employer is not barred from filing a well-grounded, objectively based action against an employee who has engaged in a protected activity," in some situations, the filing of counterclaims may constitute adverse employment action. *Id.* at 180 n.2; *accord Rosania v. Taco Bell of Am., Inc.*, 303 F. Supp. 2d 878, 888 (N.D. Ohio 2004). The central question is whether the counterclaims are filed "not in good faith and instead motivated by retaliation." *Kendel v. Loc. 17-A United Food & Com. Workers*, 835 F. Supp. 2d 421, 430 (N.D. Ohio 2011). Stated differently, the Court must find (1) "the employer acted with retaliatory motive" and (2) that the employer's counterclaims "lack a reasonable basis in fact or law." *Lynch v. Studebaker*, 2007-Ohio-4014, ¶ 20, *cause dismissed*, 2007-Ohio-5937, ¶ 20, 115 Ohio St. 3d 1480, 875 N.E.2d 964. The district court held Defendants' counterclaims "ha[d] a reasonable basis in fact and law and that [Plaintiff] ha[d] failed to demonstrate sufficient evidence of a retaliatory motive." (Order Granting Mot. for Summ. J., R. 75, Page ID # 1719.) We agree.

Defendants counterclaimed that Plaintiff misappropriated trade secrets by emailing proprietary Westfield documents from his work email to his personal email, from his work email to Tamayo's personal email, and from his personal email to his work email. Under Ohio law, "[i]n order to prevail on a misappropriation-of-trade-secret claim, [the alleging party] must show by a preponderance of the evidence: (1) the existence of a trade secret; (2) acquisition of a trade secret

as a result of a confidential relationship; and (3) the unauthorized use of a trade secret." *Handel's Enterprises, Inc. v. Schulenburg*, 765 F. App'x 117, 122 (6th Cir. 2019).

The district court extensively considered the merits of Defendants' misappropriation counterclaim and concluded that although some of the emails contained trade secrets and Plaintiff acquired such information as a result of a confidential relationship, they failed to prove Plaintiff "acquired any of the emails through improper means" because he never violated a specific Westfield policy nor proved anyone besides Plaintiff had seen the emails. (Order Granting Summ. J., R. 75, Page ID #1726.) Plaintiff does not specifically challenge any of the district court's findings, but instead argues the counterclaims are "objectively baseless" because Defendants "could not cite to a single court decision to support" their theory that emailing work documents to one's personal email account constitutes misappropriation of trade secrets. (Appellant's Br. 52-53.)

A claim is not objectively baseless simply because it fails. *See Schlaifer Nance & Co., Inc. v. Estate of Warhol*, 194 F.3d 323, 337 (2d Cir. 1999) (holding "a claim that fails as a matter of law is not necessarily lacking any basis at all"). This is exactly what the district court held: "[E]ven though [Defendant Westfield's counter]claims ultimately failed, they were based on legitimate grounds…." (Order Granting Mot. for Summ. J., R. 75, Page ID # 1730.) Defendants successfully proved two of the three elements to prove misappropriation of trade secrets. Moreover, Defendants' argument is not nearly as outlandish as Plaintiff tries to make it seem. Courts around the country have considered whether emails sent to oneself can constitute misappropriation. For example, in *Aon PLC v. Infinite Equity, Inc.*, No. 19 C 7504, 2021 WL 4192072, at *14 (N.D. Ill. Sept. 15, 2021), the court found there was a reasonable likelihood of success on a misappropriation claim when an employee "forwarded emails from his Aon email address to his personal email

address." *See generally Mintz v. Mark Bartelstein & Assocs. Inc.*, No. 2:12-CV-02554-SVW-SS, 2013 WL 12182602, at *4 (C.D. Cal. June 14, 2013); *CPI Card Grp., Inc. v. Dwyer*, 294 F. Supp. 3d 791, 809 (D. Minn. 2018). Having failed to prove Defendants' counterclaims lack a reasonable basis in fact or law, for this reason alone, Plaintiff's claim of retaliation must fail.

Plaintiff goes on, however, to argue Defendants' conduct was motivated by retaliation. This argument fails too. Plaintiff's only basis for inferring a retaliatory motive is that Westfield's management knew other employees had emailed themselves work but the only other time Defendants filed a claim against an employee for such conduct was after the employee had sued Westfield. There are many reasons an employer would not litigate every infraction employees commit. However, after an employee has hauled an employer into court, it is entirely reasonable for the employer to file its claims for minor infractions. Additionally, Defendants only filed the counterclaims after Plaintiff brought the conduct to their attention. During the parties' initial disclosures, Plaintiff mentioned he had emailed documents to his personal email account. Defendants sought leave to file the counterclaims after taking the time to audit Plaintiff's email account. Finally, these were compulsory counterclaims that, if not filed in the present action, would be barred in future litigation. *Bluegrass Hosiery, Inc. v. Speizman Indus., Inc.*, 214 F.3d 770, 772 (6th Cir. 2000) ("According to the Supreme Court, claims coming within the definition of compulsory counterclaim are lost if not raised at the proper time.").

In sum, Defendants' counterclaims were not objectively baseless nor has Plaintiff proffered enough evidence to create a genuine dispute that Defendants acted with a retaliatory motive. Consequently, we affirm the district court's grant of Defendants' motion for summary judgment on Plaintiff's retaliation claim.

### C. Bad Faith Claim

For largely the same reasons his challenge to the retaliation claim failed, Plaintiff has not proved Defendants' counterclaims were filed in bad faith. To support a claim of bad faith, a plaintiff must prove that "the claims advanced were meritless, that counsel knew or should have known this, and that the motive for filing the suit was for an improper purpose such as harassment." *Big Yank Corp. v. Liberty Mut. Fire Ins. Co.*, 125 F.3d 308, 313 (6th Cir. 1997).

The only additional argument Plaintiff makes specifically related to bad faith is that by failing to file the emails under seal, Defendants have made the supposedly proprietary information available "to anyone in the world with a PACER account." (Appellant's Br. 54.) While the world may now have access to Defendants' supposedly proprietary information, this does not change the fact that the counterclaims were not filed with an improper motive. Thus, Plaintiff has not created a genuine dispute that Defendants acted in bad faith.

### D. Motion to Alter the Judgment

Plaintiff's final argument is that the district court erred by denying his motion to alter or amend the judgment pursuant to Federal Rule of Civil Procedure 59(e). "[An] appeal from the denial of a Rule 59(e) motion is treated as an appeal from the underlying judgment itself." *GenCorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 833 (6th Cir. 1999). Because we are reversing the district court's grant of summary judgment on his age discrimination claims, this analysis is limited to Plaintiff's challenges of the retaliation and bad faith arguments.

For the same reasons explained above in the analyses addressing Plaintiff's retaliation and bad faith arguments, the district court's denial of his motion to alter or amend was proper.

Consequently, we affirm the district court's denial of Plaintiff's motion to alter or amend the judgment as it relates to his retaliation and bad faith arguments.

## III.

For the foregoing reasons, we **REVERSE** the district court's grant of summary judgment on Plaintiff's age discrimination claims and **AFFIRM** the district court's grant of summary judgment on Plaintiff's retaliation claim, finding of no bad faith, and denial of Plaintiff's motion to alter or amend the judgment as it relates to his retaliation and bad faith arguments.

**MARTHA CRAIG DAUGHTREY, Circuit Judge, concurring in part and dissenting in part.** I concur in much of the majority's opinion in this appeal. It properly affirms the district court's grant of summary judgment to Westfield Insurance Company on Steven Aday's retaliation claim, properly affirms the district court's finding that Westfield did not act in bad faith in asserting its counterclaims against Aday, and properly affirms the district court's denial of Aday's motion to alter the judgment. I part ways with the majority, however, regarding its decision to reverse the district court's grant of summary judgment to Westfield on Aday's claim of age discrimination under federal and state anti-discrimination statutes. Because I conclude that Aday failed to establish a genuine dispute of material fact regarding the company's allegedly improper animus in failing to hire him as a unit leader in the Casualty Injury/General Liability department, I respectfully dissent from that portion of the majority opinion.

Even in its discussion of Aday's age-discrimination claim, the majority reaches several conclusions with which I agree. For example, I too am convinced that, under the decisional framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), Aday sufficiently alleged a *prima facie* case of age discrimination and that Westfield articulated a legitimate, non-discriminatory reason for its hiring decision. I also agree that Aday failed to prove, under the "general pretext test," that those articulated reasons masked a more sinister discriminatory intent. *See, e.g., Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 815 (6th Cir. 2011).

We previously have recognized, however, that plaintiffs in discrimination cases also may prove pretext utilizing the relative-qualifications test. Pursuant to that test, a plaintiff may establish pretext by showing that he or she was the "plainly superior candidate, such that no reasonable employer would have chosen the latter applicant over the former." *Id.* (citations omitted). The

relative-qualifications test also allows a plaintiff to establish a triable issue of fact regarding pretext if the "plaintiff was as qualified as[,] if not better qualified than[,] the successful applicant, *and* the record contains 'other probative evidence of discrimination.'" *Id.* (citations omitted) (emphasis added).

As the majority points out, Aday cannot establish that his qualifications for the unit leader position were "plainly superior" to those of Danielle Somogyi and Curt Zito, the successful applicants. Thus, Aday's only chance to defeat Westfield's motion for summary judgment on his age-discrimination claim is to establish factual disputes both as to whether he was "as qualified" as Somogyi and Zito *and* whether the record contains "other probative evidence of discrimination."

Assuming for the sake of argument that Aday was at least "as qualified" for the posted positions as Somogyi and Zito—a fact that I do not otherwise concede—he still has failed to offer any evidence that can be considered probative of an improper, discriminatory intent on the part of Westfield. Aday has cast no aspersions on the motives of Sheila Lilly, the sole decisionmaker in the hiring process. In fact, during her deposition testimony, Lilly offered that Aday was "good at his job," that she was open "to the idea that Westfield could find another role for [Aday] where he could live on the west coast," that she was not even aware of the actual ages of the various applicants for the positions, and that, at one point during the interview process—before a comparison of the qualifications of all the candidates—she believed that Aday was "the one to beat."

Unable to impugn the motives of Lilly, Aday offers only two isolated comments *by non-decisionmakers* as evidence of Westfield's alleged discriminatory intent. Of course, "discriminatory remarks, even by a nondecisionmaker, can serve as probative evidence of pretext." *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 393 (6th Cir. 2009) (citation omitted). But remarks

"standing alone, generally do not support an inference of discrimination." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 356 (6th Cir. 1998). Here, the two remarks that Aday highlights, when viewed in their proper context, fail to support any inference of discriminatory intent whatever.

Aday first points to a comment made by Robert Bowers, a Westfield executive who had no involvement in the interview and hiring processes. According to Aday, during the summer of 2017, there had been discussions in the lunchroom at Westfield's main office about certain retirees. As Aday recalled:

> [P]eople were—several people had retired and comments would come up like, well, who's going to be the next one to, you know, to pull the plug on this. You know, things, joking, things like that. And, you know, I mean, Rob was sitting there and kind of pointing to me, going, well, this one is up, you know, kind of in the chute or something like that.

First, Aday's own testimony concedes that Bowers's comment was made in a joking manner. Second, Aday had sent an email to Bowers on June 30, 2017, in which Aday mentioned that his domestic partner, Moira Tamayo, had been offered a lucrative position in Seattle, Washington, and although Aday hoped to remain employed at Westfield, he "would like to do so with Seattle being [his] primary residence." The email further explained:

> Currently, I remain in the Cincinnati area. If unable to secure a position with the company which would allow me to make Seattle my primary residence, I was planning to submit my plan for early retirement. I was going to postpone submitting the "Intent to Retire" form as long as possible, as once I do so, it is irrevocable. To that end, I am thinking that I will wait until the end of August and if I have not identified a viable possibility for staying with Westfield, I will go forward with the retirement plans. Though I was not thinking of retirement until Moira received the offer from Amazon, HR tells me that I am fully vested and based on age would simply be considered an early retiree.

Thus, given Bowers's knowledge of Aday's retirement plans, it is not surprising that he jokingly would identify Aday as someone "kind of in the chute or something like that."

Furthermore, nothing else in the record can be construed as evidence of any discriminatory animus on the part of Bowers. Indeed, at a funeral service for another Westfield employee, a service that predated Aday's June 30 email to Bowers, Lilly and Bowers had a brief conversation regarding Aday's status with the company. According to Lilly, at that time, Bowers "confirmed that I knew [Aday's] wife got a role out in Seattle and he was going to move there, and he said he thought a lot of Steve and, you know, 'I hired Steve, and if you can do anything for Steve, that would be—that would be great.'" Jodie Hopkins, another Westfield executive who had informed Lilly that she too wanted Aday to stay employed at Westfield, stated that she also "was left with the impression that Rob would like Steve to remain with Westfield." A thorough, contextual reading of the record thus demonstrates that Bowers's joking comment about the possibility that Aday might retire cannot be considered evidence of age discrimination, either in isolation or in conjunction with any other probative evidence before the district court and before this court on appeal.

The second isolated comment highlighted by Aday also, when read in context, fails to indicate any discriminatory intent. Aday asserts that, *after* he had submitted his irrevocable "intent to retire" papers, Terrence Donald Neumeyer, a complex claims analyst with Westfield, stated, "[E]veryone thinks it's time for you to put your piggies up, relax, and let . . . your wife be the breadwinner[;] you've earned it." Neumeyer claimed, however, that he could not have intimated that anyone else thought that Aday should "put [his] piggies up" because Neumeyer was not aware of Aday's plan to move to Seattle until Aday informed him of that fact during the phone conversation. Furthermore, the comment attributed to Neumeyer simply was Neumeyer's attempt to wish Aday well in the future. Even had Neumeyer heard similar sentiments from other Westfield employees, however, the comment that Aday had earned the right to relax after his

partner secured an executive position with a major, high-paying company cannot in any way be construed as evidence that the atmosphere at Westfield was permeated with discriminatory animus.

To the contrary, the evidence in the record shows that Aday was informed that he could remain a Westfield employee for as long as he wished; he just could not do so from Seattle. Far from discriminating against Aday due to his age, both Robert Bowers and Jodie Hopkins contacted Sheila Lilly and expressed hope that some consideration could be given to retaining Aday on the company payroll. Lilly, for her part, encouraged Aday to apply for the positions but to try to "sell us on how you can make this work" from Seattle because "leadership is talking about how we need leaders in an office more often." Furthermore, the notes taken by Hopkins in the "draft room" when Lilly and other interviewers were discussing the pros and cons of the various applicants for the unit leader positions indicated that Aday's age never was a factor in the decision-making process. Instead, those notes show that the concerns regarding Aday's candidacy involved his insistence on being in Seattle (where Westfield did not have an office), his need to fly to required meetings, his prior difficulties dealing with a high-volume workload, and whether the unit leader position was a job that Aday truly desired or simply a "means to an end."

Ultimately, in the absence of any evidence of discriminatory animus in the appellate record, we must not substitute our judgment for that of management when considering the propriety of a decision to hire a particular person or persons for a specific position. *See, e.g., Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 462 (6th Cir. 2004). Indeed, "[t]he law does not require employers to make perfect decisions, nor forbid them from making decisions that others may disagree with. Rather, employers may not hire, fire, or promote for impermissible, discriminatory reasons." *Hartsel v. Keys*, 87 F.3d 795, 801 (6th Cir. 1996).

I find no probative evidence of age discrimination in this record. Consequently, I would affirm the district court's decision to grant summary judgment to Westfield on Aday's age-discrimination claims. Because the majority would reverse the decision of the district court in this regard, I respectfully dissent from that portion of the majority's opinion.