RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0356p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

────────────────

MICHAEL FLOWERS,

               *Plaintiff-Appellant*,

    *v.*

WESTROCK SERVICES, INC.,

               *Defendant-Appellee*.

No. 20-1230

────────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:18-cv-00667—Robert J. Jonker, District Judge.

Decided and Filed: November 12, 2020

Before: SUTTON, THAPAR, and READLER, Circuit Judges.

────────────────

## COUNSEL

────────────────

**ON BRIEF:** William F. Piper, WILLIAM F. PIPER, PLC, Portage, Michigan, for Appellant. Richard W. Warren, Sarah J. Hartman, MILLER, CANFIELD, PADDOCK AND STONE, P.L.C., Detroit, Michigan, for Appellee.

────────────────

## OPINION

────────────────

CHAD A. READLER, Circuit Judge. When WestRock Services denied Michael Flowers an opportunity to interview for a pipefitter position, Flowers sued the company for violating the Age Discrimination in Employment Act. Flowers, however, did not maintain the qualifications required by WestRock for the position. And outside of strict age-based considerations, the

ADEA does not empower job applicants to second-guess the qualifications preferred by a potential employer. We thus **AFFIRM** the district court's judgment in favor of WestRock.

## BACKGROUND

*Flowers's Application.* Flowers worked as a pipefitter and welder for roughly 30 years at Graphic Packaging before retiring in 2013. A few years later, Mike Engle, a WestRock employee, told Flowers that WestRock was looking for pipefitters. WestRock's online application for a "Journeyman Pipefitter" position included a section titled "Required Skills and Experience." Those skills and experiences included welding along with "[s]electing [the] type and size of pipe and related materials according to job specifications, knowledge of system operation, and study of building plans [and] working drawings." Under "Additional Requirements," WestRock instructed that the applicant "[m]ust be able to read blueprints."

Flowers submitted an application. The application did not ask for a date of birth (Flowers was 71 at the time). From her initial review, WestRock HR employee Karol Fecteau thought Flowers looked "generally qualified," and forwarded the application to Bob Klon, a team lead, and Bill Bumgart, a supervisor, for their feedback. Suffice it to say, their feedback was not positive. From his prior experience working with Flowers at Graphic, Klon felt that Flowers demonstrated a poor work ethic. Klon recalled a specific incident where Flowers chose to sit on a bucket to pass time instead of completing a pending project. So he replied to Fecteau: "no, no, no." Bumgart, who did not know Flowers, reached out to a friend, Brian Button, who had worked with Flowers at Graphic. Button told Bumgart to "stay away" from hiring Flowers, an observation Bumgart relayed to Fectau.

Having received two negative references from team leaders, Fecteau decided to reject Flowers's application. She declined the application through an online portal. An automated response informed Flowers that WestRock "decided to move forward with other applicants who more closely match the desired requirements and qualifications for the role."

*Flowers Sues WestRock.* After being rejected by WestRock, Flowers heard from Engle that a younger, less experienced worker was hired for the job. So Flowers sued WestRock for age discrimination in violation of the ADEA. In his complaint, Flowers alleged that he was

qualified for the "Journeyman Pipefitter" position and that "but for" his age, WestRock would have hired him. A pivotal issue during the ensuing litigation was whether Flowers met the stated job requirements. During discovery, Flowers admitted that he does not know how to read building blueprints nor does he have experience with selecting the type and size of pipe. He further admitted that just a couple of years earlier, he refused to get certified for certain welding activities because he "didn't want to be a welder anyway." Engle, by comparison, "welded seven days a week, twelve hours a day," when he worked as a pipefitter for WestRock.

At a hearing following the close of discovery, the district court granted WestRock's motion for summary judgment from the bench. The court found that Flowers failed to establish a prima facie case of age discrimination because he was not "otherwise qualified" for the position given his inability to read blueprints or select pipes and his unwillingness to weld. And even if Flowers could establish a prima facie case, the court explained, he failed to show that WestRock's reasons for not hiring him were false: "[W]hen we're in a failure-to-hire context and you have absolutely no experience with somebody and the former employer who you happen to know is willing to go out on a limb and say 'No, no, no' or 'stay away,' that's [a] pretty common-sense practical reason[]" for not granting an applicant an interview. This timely appeal followed.

## ANALYSIS

We review the district court's grant of summary judgment de novo. *King v. United States*, 917 F.3d 409, 421 (6th Cir. 2019) (citing *Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999) (en banc)). The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of an individual's age." 29 U.S.C. § 623(a)(1). To demonstrate an ADEA violation, a plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial) that age was the "but-for" cause of the challenged employer decision. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–78 (2009). Because Flowers relies on circumstantial evidence to advance his claim, we proceed under a burden-shifting framework. *George v. Youngstown State Univ.*, 966 F.3d 446, 459 (6th Cir. 2020) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Under that

framework, Flowers carries the initial burden of establishing a prima facie case of discrimination. *Id.* at 459. If he does so, the burden shifts to WestRock to provide a legitimate, non-discriminatory reason for its actions. *Id.* And if WestRock meets its burden, Flowers must show that WestRock's explanation was not the true reason for the employment decision. *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 887 (6th Cir. 2020). Put another way, Flowers must show it is more likely than not that WestRock's proffered reason is false and instead is pretext for discrimination. *Id.*

*Prima Facie Case*. With this framework in mind, we begin with whether Flowers established a prima facie case that WestRock refused to hire him due to his age. To make out a prima facie case, Flowers must show "(1) he was at least 40 years old at the time of the alleged discrimination; (2) he was subjected to an adverse employment action; (3) he was otherwise qualified for the position; and (4) he was replaced by a younger worker." *George*, 966 F.3d at 464 (internal citations omitted). Because Flowers was 71 at the time WestRock decided not to hire him—a decision that is considered an adverse employment action under the ADEA—the parties do not dispute that Flowers satisfies the first two elements of his claim. The parties do, however, dispute the remaining two elements.

1. Flowers's failure to show he was "otherwise qualified" for the job of Journeyman Pipefitter dooms his claim. From the summary judgment record, Flowers has not demonstrated that his "qualifications are at least equivalent to the minimum objective criteria required for employment in the relevant field," as set out in the job description. *Alexander v. CareSource*, 576 F.3d 551, 563–64 (6th Cir. 2009) (quoting *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 575–76 (6th Cir. 2003) (en banc)); *see also Highfill v. City of Memphis*, 425 F. App'x 470, 474 (6th Cir. 2011) (holding that a prima facie case looks to objective qualifications, like an employment contract, over subjective qualifications like affidavits attesting to an employee's proficiency). Noting Flowers's admission that he does not know how to select the size and type of pipes or read blueprints, two of the listed job requirements, and aware of Flowers's disinterest in welding, another job duty, the district court held that Flowers failed to show he was otherwise qualified for the position. We see no error in that conclusion. Requiring a plaintiff to establish a prima facie case under the ADEA framework serves to eliminate the most common

nondiscriminatory reasons for an employer's action. *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 776 (6th Cir. 2016) (quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254 (1981)). One such reason is an applicant's lack of qualifications. WestRock desired a pipefitter who could read blueprints and select pipes, and who also had an interest in welding. Flowers missed the mark in each respect, the first two by his own admission, and the third due to his lack of interest in welding as much as "seven days a week, twelve hours a day."

Rather than challenging those conclusions, Flowers instead challenges the premise that these skills are necessary for the position. To his mind, pipefitters do not need to read blueprints, nor should they be required to make pipe selections. But as the one who creates the position in question, the employer largely enjoys the right to decide the qualifications it prefers in one who holds the position and, it follows, whether an applicant lacks the necessary knowledge or experience. *See Wexler*, 317 F.3d at 575; *Alexander*, 576 F.3d at 563–64; *see, e.g.*, *Romano v. Hudson City Sch. Dist.*, 772 F. App'x 258, 265 (6th Cir. 2019) (holding that the plaintiff failed to establish a prima facie case because she lacked a required credential for the job); *Brown v. City of Cleveland*, 294 F. App'x 226, 231–32 (6th Cir. 2008) (same). And given an employer's superior knowledge of its workplace and industry, the employer's stated job requirements will typically be the objective criteria by which we measure a fail-to-hire claim. *See George*, 966 F.3d at 464–65 (quoting *Wexler*, 317 F.3d at 576) (acknowledging that "the specific qualifications will vary depending on the job in question" and plaintiff must demonstrate "possession of the required general skills"); *Alexander*, 576 F.3d at 564 (holding that a job description amounts to evidence of the minimum job qualifications). Who, after all, better understands the relevant field and the corresponding skills necessary to succeed than the employer? Not a federal court, one reason why we do not "substitute [our] judgment for that of management" when it comes to business decisions like setting necessary job qualifications. *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 462 (6th Cir. 2004) ("[I]t is inappropriate for the judiciary to substitute its judgment for that of management." (quoting *Smith v. Leggett Wire Co.*, 220 F.3d 752, 763 (6th Cir. 2000))).

Nor, for many of these same reasons, do we accept Flowers's invitation to consider his subjective opinion of the relevant job criteria over that expressed by WestRock. *See id.* at 462

(explaining that a plaintiff's subjective view of his or her qualifications, without more, cannot sustain a claim of discrimination). Had Flowers been operating WestRock, perhaps he would have crafted the pipefitter position a different way. But the shoe is on the other foot. And in that respect, we see no reason not to honor WestRock's "business decisions" with respect to future employee expectations. *Cf. Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365, 372 (6th Cir. 1999) (explaining, in an ADEA termination case, that an employee "must prove that he was performing his job at a level which met his employer's legitimate expectations," as the Court's focus is on an "employer's reasonable satisfaction" with employee performance) (internal citation omitted).

It may be the case that, in some unique instances, an employer's stated non-discriminatory considerations might mask discriminatory motives. *Wexler*, 317 F.3d at 575 (quoting *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1298 (D.C. Cir. 1998) (en banc)). We held in *Wexler*, for instance, that the evidence there was disputed enough to prevent us from deciding as a matter of law whether a current employee's demotion was due to job performance, as opposed to a prohibited reason, as the plaintiff alleged. *Id*. at 577–78. But discriminatory motive is quite unlikely here when, as Flowers concedes, he lacks a specific skill or experience required by the employer. True, Flowers had years of experience in the field, and he met most of the criteria listed in the job posting. Yet WestRock had certain other skills in mind for the position that Flowers either was unable or unwilling to perform. There is no indication that impermissible age considerations played any factor in WestRock's decision.

Equally distinguishable is the one-off scenario presented in *George v. Youngstown State University*. *See* 966 F.3d at 463–66. George, an assistant professor of mathematics, physics, and engineering at Youngstown State University, upon being denied tenure and not having his teaching contract renewed, applied to work in a student services role in the University's math department. *Id*. at 454. Although George lacked a master's degree in math, a qualification the University required for the position, he held dual bachelor's degrees in math and engineering, a master's degree in education (with a concentration on math), a doctorate in education, and a teaching license in mathematics. *Id*. at 465. The University rejected George due to his failure to meet the job requirements—specifically, his failure to hold a master's degree in math. *Id*. Against the backdrop of numerous long-running employment-related disputes between George

and the University, we concluded that a reasonable jury could question the University's motives in not hiring George, and that George's credentials were a functional equivalent to the required degree, meaning he met the position's minimum objective qualifications. *Id.* at 457, 465. But Flowers does not cite a history of animosity with WestRock. Nor, critically, does he argue that he possesses an equivalent skill to those he lacks; he only casts doubt on the necessity of those skills. Because Flowers, by his own admission, objectively lacked those credentials, we agree with the district court that Flowers does not satisfy the "otherwise qualified" element of a prima facie case.

2. Even if Flowers established a prima facie case of discrimination, the district court correctly found that he failed to establish that WestRock's justification for not hiring him was pretext for discrimination. WestRock claims it did not hire Flowers because his would-be supervisors thought poorly of Flowers's work ethic, either from their personal experience or industry references. Flowers can refute this legitimate, nondiscriminatory justification by showing that it "(1) has no basis in fact, (2) did not actually motivate [WestRock's] challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 815 (6th Cir. 2011) (quoting *Wexler*, 317 F.3d at 576). To do so, Flowers must provide evidence from which a jury could reasonably reject WestRock's explanation for why Flowers was not hired. *Miles*, 946 F.3d at 888. We can easily resolve ground one. It requires evidence that WestRock's stated reasons simply did not happen, yet Flowers does not deny the existence of the negative references. *Gray v. Toshiba Am. Consumer Prod., Inc.*, 263 F.3d 595, 600 (6th Cir. 2001).

Turning to the second ground, Flowers fails to provide a single piece of evidence, not even circumstantial, indicating that his age was a factor at any point in the hiring process. *See Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009) (quoting *Wexler*, 317 F.3d at 570) (circumstantial evidence "is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred"). Start with Flowers's job application. Neither his age nor his photo was included. True, the application did reflect Flowers's employment history, which revealed 37 years of total experience. But, as the district court observed, Flowers could have been as young as 55 if he began employment out of

high school.  Although that age would satisfy the first element of a prima facie case, it is close to the exact age of the only comparator Flowers could offer.  And then consider WestRock's internal communications, none of which refer to Flowers's age.  The most Flowers can point to are the statements "no, no, no" and "stay away," which he says are coded references to his age.  Yet that is pure speculation deserving of no weight.

Nor has Flowers cast doubt on the conclusion that the negative references (rather than his age) motivated WestRock's decisionmaking.  *See, e.g.*, *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 592 (6th Cir. 2002) (finding that shifting justifications for firing is evidence of pretext).  Flowers reads Fectau's statement that Flowers looked "generally qualified" based on her review of his application juxtaposed with the subsequent negative reviews from others, as a shifting justification for the decision not to hire him.  But Fectau's observation came as part of a "first pass" of the application, before it was sent to Klon and Bumgart, who emphatically rejected Flowers's candidacy.  Rather than a shifting justification, these events seemingly reflect nothing more than WestRock's sequential process for considering applicants.

Nor do we find evidence of discrimination in WestRock's automated email response to Flowers's application, which stated that the company decided "to move forward with other applicants who more closely match the desired requirements and qualifications for the role."  Noting that WestRock did not, in fact, move forward with another candidate, Flowers portrays the email as circumstantial evidence of WestRock's discriminatory motives.  This too is pure speculation.  The statement was generic, form language in an automated email, a poor basis from which to draw insight into WestRock's decisionmaking.  Accepting Flowers's contention, moreover, seemingly would impute a legal duty on employers to reject applicants in blunt, precise terms.  Some employers may have no objection to telling someone like Flowers that he was not hired because two people, including a prior coworker, thought he had a bad work ethic.  Yet many others surely would prefer to respect social etiquette, avoiding hard truths when possible.  Either way, certainly the ADEA does not require the former, nor does it suggest that the latter is evidence of age discrimination.

Flowers fares no better in arguing that his negative references were an insufficient reason to not hire him, a third potential ground for proving pretext.  In theory, he could make this

showing by providing evidence that a virtually identical individual outside the protected class was hired, while Flowers was not. *Cf. Miles*, 946 F.3d at 893 (applying this theory to disparate workplace discipline); *see also Gray*, 263 F.3d at 600. Flowers says there are three such WestRock employees. Yet of the three, WestRock provided evidence that one was hired *before* Flowers applied, and another was already employed by the company before being moved into a pipefitting apprenticeship. And as to the third, Flowers provides no evidence that the employee received negative references or lacked required skills as did Flowers.

As a final salvo, Flowers invokes an economic rationality argument to justify his age claim. Noting that WestRock paid two contractor pipefitters substantially more than he would have been paid as an employee, Flowers paints this purported "irrational economic decision" as evidence of age discrimination. True, in some circumstances we may consider the reasonableness of an employer's decision to the extent it explains whether an employer's proffered reason for an employment action was its actual motivation. *Wexler*, 317 F.3d at 576. Whether WestRock relied on temporary contractors, however, has little bearing on whether the company was motivated by the negative references.

*Cat's Paw*. Failing on these fronts, Flowers embraces a novel understanding of what has come to be known as the "cat's paw" theory of discrimination. The customary application of that theory involves a supervisor who "performs an act motivated by [prohibited] animus that is *intended* by the supervisor to cause [the formal decisionmaker to take] an adverse employment action." *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011). Where a supervisor engages in that type of conduct, and where the supervisor's "act is a proximate cause of the ultimate employment action, then the employer is liable." *Id*. This theory of liability serves to prevent the ultimate decisionmaker—for example, a middle manager—from being a shield for a supervisor's discriminatory intent.

While this theory has been applied to purported discrimination against a company's current employees, it is quite another thing to extend it to mere job applicants as well. Doing so would place a tremendous burden on human resources employees in culling through applications. After all, a disgruntled applicant could always allege that those employees did not do enough diligence in considering an applicant's references, both positive and negative, and that

one reference or another had some impermissible bias. If every reference comes with a federal duty to investigate, hiring will become exceedingly tedious, especially with the volume of applications submitted through today's digital platforms. That is unlike the narrower focus of a cat's paw claim asserted by a current employee or group of employees.

To the same end, whereas the relevant job history for a current employee is likely internal to the company, in the hiring context the relevant history will often lie with another employer. That makes those matters difficult to investigate. Nor, it bears emphasizing, should an employer be liable for the bias of an outsider. Take this case, for example, where one of the negative reviews of Flowers came not from a WestRock supervisor but rather from an employee of another company. While the cat's paw theory might apply to root out supervisory employees who attempt to shield their discriminatory motives through an internal third-party, it makes little sense to apply that same theory to an allegedly impermissible motive that stems from one who does not even work for the company in question. In the district court's words, extending the cat's paw theory as Flowers urges is simply "beyond the pale."

Even were we to accept this novel theory, Flowers comes up short on the evidentiary front. Assuming Flowers means that Fectau is the cover for Klon and Bumgart (or Button), "there's no indication in the record," the district court concluded, "independently to suggest [Klon, Bumgart, or Button] have age bias." Flowers's claim thus fails on this basis as well. *Chattman v. Toho Tenax America, Inc.*, 686 F.3d 339, 351 (6th Cir. 2012) (observing that the cat's paw theory requires, among other things, proof of a supervisor's discriminatory animus).

## CONCLUSION

For the reasons stated above, we **AFFIRM** the judgment of the district court.