NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0167n.06

No. 21-5683

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Apr 22, 2022
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| FRED COURTNEY, | ) | |
| Plaintiff - Appellant, | ) ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF TENNESSEE |
| WRIGHT MEDICAL TECHNOLOGY, INC., | ) | |
| Defendant - Appellee. | ) | OPINION |
| | ) ) | |

Before: COLE, CLAY, and THAPAR, Circuit Judges.

CLAY, J., delivered the opinion of the court in which COLE, J., joined. THAPAR, J. (pp. 18–22), delivered a separate opinion concurring in part and in the judgment.

CLAY, Circuit Judge. Plaintiff Fred Courtney ("Plaintiff" or "Courtney") appeals the district court's order granting Defendant Wright Medical Technology, Inc.'s ("Defendant" or "WMT") motion for summary judgment on Plaintiff's age discrimination claims. Plaintiff's complaint alleged that Defendant terminated Plaintiff in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 (1967), and the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-401. For the reasons set forth below, we **REVERSE** the district court's order granting Defendant's motion for summary judgment and **REMAND** the case for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. Factual Background

Defendant WMT hired Plaintiff in April 2010, when Plaintiff was 45 years old. From 2010 through approximately 2017, Plaintiff was a Senior Director of Facilities and Maintenance at WMT. Thereafter, Courtney's role grew to encompass additional environmental, health, and safety responsibilities. Throughout Courtney's tenure, he received annual performance reviews via formal reports generated by WMT. Those reports show that Courtney either met or exceeded expectations for his role throughout his time at the company. Specifically, in 2015, Courtney's performance was evaluated as "outstanding;" in 2016 and 2017, he "exceeded expectations;" and in 2018, the year before he was terminated, Courtney's report reflected that he met expectations. (*See* Ex. B to Pl.'s Mot. Summ. J., R. 56, Page ID # 404–18.)

During Courtney's first seven years at WMT, he was supervised by Bob Burrows ("Burrows"), the Senior Vice President of Global Operations at WMT. However, Barry Regan ("Regan") replaced Burrows in July 2018. Regan came to WMT from Smith & Nephew, another medical device corporation. A profile about Regan's accomplishments in his prior role indicated that he replaced 80 percent of the senior and middle leadership team at Smith & Nephew and also established the leading graduate development program in the mid-South while he was there. Although Regan denied that his accomplishments at Smith & Nephew reflected a plan to replace older employees with younger employees, his profile allegedly caused Courtney and other WMT employees to fear that Regan intended to do so in his new role at WMT.

WMT fired Courtney approximately one year after Regan joined the company, when Courtney was 54 years old. The company claimed that Courtney was terminated "due to disruptive behavior and inability to work effectively with his supervisor, Barry Regan." (Def.'s Mot. Summ.

J., R. 53-1, Page ID # 145.) Regan made the termination decision; however, the parties dispute the extent to which Regan consulted with Human Resources and attempted to improve Courtney's alleged deficiencies prior to his termination. According to WMT, Courtney "already had ongoing issues with senior leadership" when Regan began to supervise him. (Def.'s Statement of Facts, R. 53-2, Page ID # 159–160.) Regan testified that "there was a gross mismatch between the expectations of how a leader performs at Wright and the way that Mr. Courtney was performing." (*Id.* (quoting Regan Dep., R. 53-4, Page ID # 210).) However, Regan stated that these concerns did not come "from a performance point of view," and that Courtney "[n]ever had an issue with performance." (Regan Dep., R. 53-4, Page ID # 210.) Instead, Regan said that his concerns were centered around "style, approach, [and] behavior," (*id.* at Page ID # 207), and "just effectiveness in operating across and up and down a large corporation," (*id.* at Page ID # 210). Regan claimed that Courtney did not make a visible effort to improve in these areas despite his "coaching." (*Id.* at Page ID # 207.)

Courtney, on the other hand, claimed that he "was qualified for his position and successfully performed the work," which included managing and directing other employees and teams, "as demonstrated by his consistent positive performance reviews." (Pl.'s Statement of Facts, R. 55-1, Page ID # 305.) Contrary to Regan's testimony, he asserted that WMT could not identify any executives who were dissatisfied with Courtney's approach. Additionally, Courtney emphasized that Regan never engaged in WMT's formal progressive disciplinary procedures that are in place to address personnel deficiencies, despite Regan's claims that he held a coaching session with Courtney. Courtney also underscored that his 2018 performance evaluation, which

was conducted by Regan, indicated that Courtney met expectations in his role between January and December of 2018.

The parties also dispute the nature and legitimacy of the justifications provided by WMT for Courtney's termination. WMT cited three discrete incidents. First, WMT referenced an email exchange in which Courtney allegedly provided an inadequate explanation when Regan asked why a specific type of sprinkler system had been installed in one of the company's warehouses. WMT claimed that Plaintiff did not "provide the requested information to Mr. Regan and was clearly very coy and short in his responses to his supervisor," omitting a "narrative explanation as to the decision-making process." (Def.'s Statement of Facts, R. 53-2, Page ID # 161.) Plaintiff, on the other hand, argued that he provided Regan with adequate reasoning by sending an email that included a copy of the fire code, which showed that the in-rack sprinklers that were selected were required as a means of fire protection. The parties' emails state the following:

> **From:** Regan, Barry
> **Sent:** Wednesday, May 1, 2019 3:40 PM
> **To:** Courtney, Bud R.
> **Subject:** Sprinkler System
>
> Why do we have in-rack sprinkler systems in Arlington warehouse. In 25 years, I have never seen this, even in warehouses where we had large quantities of solvents and other chemicals being stored. This is ridiculous and was a terrible waste of money. This is completely over engineered, and now provides an expensive problem as we move racks around the warehouse to meet our growth needs. How did this happen? I only want ceiling sprinklers going forward, when we move or reinstall racking. Please confirm we can make this happen.
> Thanks,
> Barry

> **From:** Courtney, Bud R.
> **Sent:** Thursday, May 2, 2019 10:46 AM
> **To:** Regan, Barry
> **Subject:** RE: Sprinkler System
>
> Barry
> Please see the attached documents in reference to your comments.
> NFPA – 13 and IBC-2006 also applies but I don't have hard copies of those documents. If you would like to see those I will try to acquire them. Shelby County code enforcement and Arlington code adopted these codes for fire protection in 2006. I have also attached the documentation from our insurance provider,
> Thanks,
>
> Bud Courtney
>
> **From:** Regan, Barry
> **Sent:** May 2, 2019 12:25 PM
> **To:** Courtney, Bud R.
>
> I didn't ask for the spec sheet or quote. Can you answer my questions below please?
> Thx.
>
> **From:** Courtney, Bud R.
> **Sent:** Thursday, May 2, 2019 12:33 PM
> **To:** Regan, Berry
> **Subject:** Re: Sprinkler System
>
> The sprinklers are a code requirement and we cannot remove them.
> Thanks
> Bud

(Ex. B to Pl.'s Mot. Summ. J., R. 56, Page ID # 391–92.) The parties dispute whether this exchange contained the information that Regan requested from Courtney. (*Compare* Pl.'s Statement of Facts, R. 55-1, Page ID # 305 *with* Def.'s Statement of Facts, R. 53-2, Page ID # 161.)

The second incident cited by WMT was related to the first. Defendant claimed that following the email exchange, Courtney "went to the Arlington Fire Department and clearly disparaged Mr. Regan." (Def.'s Statement of Facts, R. 53-2, Page ID # 161; *see also* Def.'s Mot. Summ. J., R. 53-1, Page ID # 147.) Regan based this conclusion on two letters that the Arlington Fire Department sent WMT. When Regan approached Courtney about the letters, Regan quoted

various passages and took issue with the accuracy and appropriateness of their content. Regan was specifically angry that a staff member had apparently communicated his "feelings about the current sprinkler system . . . without [his] consent or prior approval." (Ex. B to Pl.'s Mot. Summ. J., R. 56, Page ID # 397.) In relevant part, one of the letters from the fire department stated as follows:

> Recently there has been much inquiry by *several representatives* of Wright Medical as to the reason in rack sprinklers were installed in the facility (insert address) when it was constructed. It seems that current management has suddenly become upset because they cannot modify the facility for future needs. You may continue to ask the wrong sources as to why in rack sprinklers were required. Chief Harvill and I have offered on more than one occasion to meet with the Manager that is so upset with the current facility configuration. [] The following information may prove helpful in answering their questions and concerns.

(*Id.* at Page ID # 398 (emphasis added).) The second letter contained similar language, and it also stated that that there had been multiple related inquiries from various WMT employees.

In his deposition, Courtney testified that he indeed contacted the Fire Department; however, Courtney contended that he did so only to request copies of the fire code to provide to Regan. According to Courtney, the Fire Chief asked for an explanation regarding Courtney's request. Courtney said that he "told [the Fire Chief] that we were under new management and that management want[ed] to reconfigure the warehouse and they want[ed] to know if they could change the sprinkler systems. That was pretty much the end of the conversation." (*Id.* at Page ID # 187.) Courtney denied disparaging Regan.

WMT cited one final incident in support of its justification for firing Courtney. It claimed that in May 2019, Courtney was unprofessional while communicating with a WMT scientist, Jason Hoffbeck ("Hoffbeck"), who had travelled to Memphis to meet with contractors that were assigned to a new project. Hoffbeck was apparently not well received by the contractors, and Plaintiff

approached Hoffbeck after the incident. According to WMT, Plaintiff's response was inappropriate. WMT claims that Courtney said the following to Hoffbeck:

> You're lucky you didn't get your ass whooped. People come over here, you know, making those kind of statements to these kind of guys, you're lucky they didn't carry you out behind the trailer and whoop your ass.

(*Id.* (citing Philip Ward Dep., R. 53-12, Page ID # 254.) Another employee who witnessed the interaction testified that Courtney's "posture was indicative of someone that was agitated and confrontational," and WMT claimed that this incident was "escalated to Human Resources." (*Id.*) However, the parties dispute the extent to which the conversation was confrontational and/or problematic, and whether the interaction amounted to a "workplace violence incident." (*Compare* Def.'s Mot. Summ. J., R. 55-2, Page ID # 314 *with* Pl.'s Statement of Facts, R. 55-1, Page ID # 305–306.) Plaintiff underscores that according to Hoffbeck, Courtney "comment[ed] on the way that [Hoffbeck] had talked to the contractors," but did not raise his voice or threaten him. (Hoffbeck Dep., R. 61-6, Page ID # 637–38.)

WMT fired Courtney on or around June 1, 2019. WMT replaced Courtney with 42-year-old Scott Medley. In addition to his own termination, Courtney alleged that WMT fired four other employees between the ages of 50 and 70 and replaced them with younger individuals under Regan's leadership. He also claimed that Regan replaced those individuals with "participants of [Regan's] own graduate development program." (*Id.*) In support of these claims, Plaintiff cited the testimony of Ken Duda ("Duda"), another former WMT employee who worked in Human Resources. Duda testified that he "was fired approximately thirteen months after Mr. Barry Regan took over as Senior Vice President of Global Operations," at the age of 66. (Duda Decl., R. 61-3, Page ID # 557–58.) Duda added that he knew "several other employees, all of whom are over the age of forty (40), who also were fired from their employment with WMT or demoted after Mr.

7

Regan assumed the Senior VP role."[1] (*Id.* at Page ID # 559.) According to Duda, "firing these individuals from their positions reduced the average employee age in Global Operations from the low 50's to low 40's."[2]

In response, Defendant argued that each of the individuals that Courtney referenced either voluntarily resigned or were not replaced by younger employees. But WMT confirmed that at least one of the replacements was less than 50 years old, and it neither confirmed nor denied whether any of the replacements had previously been a part of Regan's graduate development program.[3]

### B. Procedural History

Courtney filed the instant complaint in May 2020, after he exhausted his claims through the Memphis office of the U.S. Equal Employment Opportunity Commission ("EEOC"). He alleged that Defendant terminated him in violation of the ADEA and THRA. WMT answered and

---

[1] In support of this testimony, Duda emphasized his prior role as a Human Resources Business Partner, which allegedly put him "in a unique position to watch Mr. Regan carefully and observe both how he interacted with his subordinates and how he operated his department," given that the role required Duda to be involved "in hiring, on-boarding, and terminating employees in the Global Operations division of WMT." (Duda Decl., R. 61-3, Page ID # 557–58.)

[2] Defendant claims that Duda's declaration is not credible. (*See* Appellee's Br. 30.) However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ." *Anderson*, 477 U.S. at 255.

[3] Importantly, WMT submitted two different declarations that provide slightly different justifications for the departures of each of the employees that Courtney referred to. As to Duda, one declaration asserts that he "voluntarily resigned his employment with Wright Medical, and his position was not subsequently filled." (Duda Decl., R. 53-18, Page ID # 282.) The other states that "Ken Duda was aware he was not meeting expectations and requested that he be permitted to resign. He was offered a severance that was negotiated to assist him in an exit strategy." (Second Ulrich Decl., R. 65-1, Page ID # 747.) While these justifications are not necessarily inconsistent with one another, they call into question the district court's deference to the "sworn Declaration[s] of Defendant's Human Resources director," particularly in light of the fact that those declarations are disputed by Plaintiff. (Order, R. 71, Page ID # 798; *see also* Complaint, R. 1, Page ID # 8; *see also* Duda Decl., R. 61-3, Page ID # 557–58.)

the parties filled cross-motions for summary judgment.  The parties responded, and the district

court issued an order granting Defendant's motion for summary judgment and denying Plaintiff's

motion for summary judgment in June 2021.  Plaintiff timely appealed.

## II. DISCUSSION

This Court reviews a district court's grant of summary judgment *de novo*.  *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 771 (6th Cir. 2018) (citing *Schleicher v. Preferred Sols., Inc.*, 831 F.3d 746, 752 (6th Cir. 2016)).  "Summary judgment is proper where 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *Mutchler v. Dunlap Mem'l Hosp.*, 485 F.3d 854, 857 (6th Cir. 2007) (quoting Fed. R. Civ. P. 56(a)).  A material fact is "one 'that might affect the outcome of the suit,' and a genuine dispute exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Bethel v. Jenkins*, 988 F.3d 931, 938 (6th Cir. 2021) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The ADEA and THRA prohibit employers from terminating an employee "because of such individual's age."[4]  29 U.SC. § 623(a) (1967); Tenn. Code Ann. § 4-21-401.  When a Plaintiff's claim is based on circumstantial evidence, the Court applies the burden-shifting framework set out by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973).  *See McDonnell Douglas Corp.*, 411 U.S. at 802–03; *Thompson v. Fresh Prod., LLC*, 985 F.3d 509, 522 (6th Cir. 2021).  Under this framework, a plaintiff bears "the initial burden of establishing a prima facie case of

---

[4] The Court "appl[ies] the same analysis to age-discriminations brought under the THRA as those brought under the ADEA." *Bender v. Hecht's Dept. Stores*, 455 F.3d 612, 620 (6th Cir. 2006) (citing *Johnson v. Collins & Aikman Auto. Interiors, Inc.*, No. 1:02-CV-365, 2004 WL 1854171, at *3 (E.D. Tenn. Feb. 26, 2004)).

discrimination." *Flowers v. WestRock Servs., Inc.*, 979 F.3d 1127, 1130 (6th Cir. 2020). If the plaintiff satisfies this burden, the burden shifts to the employer to articulate some "legitimate, non-discriminatory reason" for the alleged discriminatory action. *Id.* The burden then shifts back to the plaintiff to provide evidence showing that the reasons provided are pretextual. *Id.* "At the summary judgment stage, [courts] must determine whether there is 'sufficient evidence to create a genuine dispute [regarding] . . . the *McDonnell Douglas* inquiry.'" *Rachells v. Cingular Wireless Emp. Servs., LLC*, 732 F.3d 652, 661 (6th Cir. 2013) (citing *Macy v. Hopkins Cnty. Sch. Bd. Of Educ.*, 484 F.3d 357, 364 (6th Cir. 2007) (quoting *Cline v. Catholic Diocese of Toledo*, 206 F3d 651, 661 (6th Cir. 2000))).

The district court erred when it granted Defendant's motion for summary judgment. Although it correctly found that Courtney stated a prima facie case of age discrimination, it erroneously concluded that "there is no genuine dispute of material fact as to pretext, no conflict between the stated reasons for the termination, and no proof of an age-based decision." (Order, R. 71, Page ID # 793.)

## A. Prima Facie Showing of Age Discrimination

The district court correctly determined that Plaintiff stated a prima facie case of age discrimination. (Order, R. 71, Page ID # 792.) To demonstrate a prima facie case of age discrimination, Plaintiff must show: "(1) he was at least 40 years old at the time of the alleged discrimination; (2) he was subjected to an adverse employment action; (3) he was otherwise qualified for the position; and (4) he was replaced by a younger worker." *George v. Youngstown State Univ.*, 966 F.3d 446, 464 (6th Cir. 2020).

Courtney met this burden. First, Courtney demonstrated that he was 54 years old when WMT fired him, which placed him in a protected class based on his age. *See* 29 U.S.C. § 631.

Second, Courtney showed that WMT took an adverse employment action against him by terminating him in June of 2019.  Next, the record clarifies that Courtney was qualified for his job given that he performed it without incident for eight years, and he either met or exceeded the expectations throughout his tenure.  *See supra* p. 2.  Indeed, Defendant agrees that Courtney's termination was not based on performance or Courtney's inability to perform the role for which he was hired.  Finally, Courtney provided undisputed evidence that WMT replaced him with a substantially younger individual, namely, 42-year-old Scott Medley.

## B. Defendant's Reasons and Alleged Pretext

In its motion for summary judgment, WMT claimed that it terminated Courtney "due to disruptive behavior and inability to work effectively with his supervisor, Barry Regan."  (Def.'s Mot. Summ. J., R. 53-1, Page ID # 145.)  It referenced the three discrete incidents listed above as evidence of this "disruptive behavior and inability to work effectively" with Regan, namely, (1) the email exchange about the in-rack sprinkler system; (2) the letters from the Arlington Fire Department; and (3) Courtney's conversation with Hoffbeck.  *See supra* pp. 4–7; (*see also id.* at Page ID # 145–48).

Courtney argues that there are genuine and material factual disputes as to the pretextual nature of WMT's reasoning.  *See White*, 533 F.3d at 393.  Plaintiff can demonstrate that such reasons are in fact pretextual by providing evidence showing "that the employer's stated reason[s] for the adverse employment action . . . (1) ha[ve] no basis in fact, (2) w[ere] not the actual reason, or (3) [are] insufficient to explain the employer's action."  *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 (6th Cir. 2008) (citing *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 545 (6th Cir. 2008)).  A plaintiff "may also demonstrate pretext by offering evidence which challenges the reasonableness of the employer's decision 'to the extent that such an inquiry sheds light on

whether the employer's proffered reason for the employment action was its actual motivation.'" *White*, 533 F.3d at 393 (quoting *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 578 (6th Cir. 2003)). Viewing the facts in the light most favorable to Plaintiff, Plaintiff "has produced enough evidence for a reasonable jury to infer that [WMT]'s proffered explanation for its hiring decision may be merely a pretext for unlawful discrimination." *White*, 533 F.3d at 394–94; *Anderson*, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.") (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)); *see also Brewer v. New Era, Inc.*, 564 F. App'x 834, 840 (6th Cir. 2014).

First, a reasonable jury could find that WMT's claims about the email exchange are not factually supported and provide an insufficient basis for Courtney's termination. *See generally White*, 533 F.3d at 393; *see also supra* pp. 4–5. As previously discussed, the parties dispute whether Courtney's responses contained the information that Regan requested. Viewing the evidence in Plaintiff's favor, a jury could determine that the emails from Courtney did provide "an explanation as to why there were in-rack sprinklers in the Arlington warehouse" and also gave a "narrative explanation as to the decision-making process." (Def.'s Mot. Summ. J., R. 53-1, Page ID # 146.) Indeed, the emails show that Courtney did more than "simply attach[] documents related to code and insurance guidelines." (*Id.*) Courtney's responses cite the relevant fire code provisions and discuss the fact that those provisions applied to the warehouse in question. *See supra* pp. 4–5. The emails also call into question Defendant's contention that Plaintiff was "evasive," "coy," and "short" in his communications with Regan. (Def.'s Mot. Summ. J., R. 53-1, Page ID # 146; Def.'s Statement of Facts, R. 53-2, Page ID # 161.) To the contrary, the emails indicate that Regan initiated the conversation with stern and accusatory language. (*See* Ex. B to

Pl.'s Mot. Summ. J., R. 56, Page ID # 391–92) ("In 25 years[,] I have never seen this . . . . This is ridiculous and was a terrible waste of money."); *see also supra* p. 4.

Additionally, a reasonable jury could question the factual basis and the conclusions drawn from the second incident: WMT's exchange with the Arlington Fire Department. *See generally White*, 533 F.3d at 393; *see also supra* pp. 5–7. In its summary judgment motion, WMT argued that Courtney "went to the Arlington Fire Department and clearly disparaged Mr. Regan." (Def.'s Mot. Summ. J., R. 53-1, Page ID # 147.) However, the letters from the fire department fail to confirm this allegation. Indeed, each letter suggests that the fire department received "several inquiries" from various "Wright Medical Representatives." (Ex. B to Pl.'s Mot. Summ. J., R. 56, Page ID # 398, 401); *see also supra* pp. 5–7. The letters also fail to show that Regan was "clearly disparaged" by any of the inquiries. Rather, the letters indicate the fire department was informed that "current management" requested an explanation regarding the need for the sprinkler system. (Ex. B to Pl.'s Mot. Summ. J., R. 56, Page ID # 398, 401.) Drawing all inferences in favor of Plaintiff, the letters thus fail to substantiate the allegation that Courtney "went to the Arlington Fire Department and clearly disparaged Mr. Regan." (Def.'s Mot. Summ. J., R. 53-1, Page ID # 145–147.) Nor do they reflect Courtney's alleged inability to work with Regan. To be sure, Courtney testified that he contacted the Fire Department to ask for copies of the relevant fire code provisions. But a reasonable jury could find that this demonstrated Courtney's desire to thoroughly answer Regan's questions, rather than any attempt to denigrate Regan or his reputation.

Furthermore, a reasonable jury could determine that the third incident cited by WMT also supports a pretext finding. Indeed, there are factual disputes regarding WMT's assertions about the May 2019 incident between Courtney and Hoffbeck and whether those assertions align with WMT's stated reasons for firing Courtney. (Def.'s Mot. Summ. J., R. 53-1, Page ID # 145 (stating

that Courtney was allegedly fired "due to disruptive behavior and inability to work effectively with his supervisor, Barry Regan")); *see also supra* p. 7. Importantly, the parties dispute the nature and severity of the interaction as well as Defendant's contention that it amounted to "workplace violence." (*Compare* Def.'s Mot. Summ. J., R. 55-2, Page ID # 314 *with* Pl.'s Statement of Facts, R. 55-1, Page ID # 305–306.) Plaintiff asserts that the interaction between Courtney and Hoffbeck was neither confrontational nor violent. Indeed, Hoffbeck testified that while Plaintiff "comment[ed] on the way that [Hoffbeck] had talked to the contractors," Courtney neither raised his voice nor threatened him. (Hoffbeck Dep., R. 61-6, Page ID # 637–38.) Viewing this evidence in Plaintiff's favor, a jury could determine that the incident served as pretext for WMT's termination. The jury could rely on the fact that that the record contains no evidence that the incident was elevated through Human Resources or was otherwise processed as a workplace violence incident.

Critically, each of Defendant's proffered explanations suffer from one additional flaw. In an attempt to cite "legitimate, non-discriminatory reason[s] for the adverse employment action," Defendant claims that Courtney "already had ongoing issues with senior leadership" prior to Regan's arrival at WMT. *White*, 533 F.3d at 391; (Def.'s Statement of Facts, R. 53-2, Page ID # 159–160). However, prior to Regan's arrival, all of Courtney's available reviews indicate that he either exceeded expectations or was outstanding in his role, and WMT was simultaneously unable to identify any other individuals with whom Courtney allegedly "had ongoing issues." (*See* Ex. B to Pl.'s Mot. Summ. J., R. 56, Page ID # 404–18; *see also* Pl.'s Statement of Facts, R. 55-1, Page ID # 305.) Additionally, any "issue" that predated Regan's arrival at the company is tangential to WMT's argument that Courtney was unable to "work effectively with his supervisor, Barry Regan." (Def.'s Mot. Summ. J., R. 53-1, Page ID # 145.)

All told, WMT's explanation for its termination decision relied on disputed facts that Plaintiff has since rebutted. The evidence on the record raises genuine and material questions regarding whether WMT's stated reasons for terminating Courtney were "its actual motivation." *Wexler*, 317 F.3d at 578. Accordingly, Plaintiff's pretext arguments should be heard by a jury.[5] *See White*, 533 F.3d at 393; *see also Blair v. Henry Filters, Inc.*, 505 F.3d 517, 532 (6th Cir. 2007).

### C. Other Evidence of Age Discrimination

In its order, the district court further concluded that it could not consider "the allegation of a string of age-based terminations" because they were "not properly supported." (Order, R. 71, Page ID # 798.) But the district court glossed over various material disputes that are indeed left unanswered by the record.

In regard to Plaintiff's contention that other "employees over the age of 40 were fired based on their age," the district court asserted that the record showed that "only one of those employees

---

[5] Plaintiff argues that the district court ignored his evidence of discrimination by erroneously invoking the business judgment rule. In support of this contention, Plaintiff points to the district court's conclusion that "it is not for the [c]ourt to review the business decisions of an employer." (*Id.* at 28 (citing Order, R. 71, Page ID # 797.) However, the district court explicitly excluded "discriminatory decisions" from its stated deference to WMT's business decisions. (Order, R. 71, Page ID # 797 ("However, with the exception of discriminatory decisions, it is not for the Court to review the business decisions of an employer.").) *See White*, 533 F.3d at 393. Accordingly, the district court's invocation was not erroneous.

That said, Plaintiff's arguments and proffered evidence are distinguishable from the Court's prior cases that hinge on an employer's "honest business judgment." *See Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1116–17 (6th Cir. 2001); *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 889–90 (6th Cir. 2020). Unlike the plaintiffs in those cases, Courtney does not merely attempt to meet his pretext burden by providing a new or different interpretation of his performance at the company. *Majewski*, 274 F.3d at 1116; *Miles*, 946 F.3d at 889–90 (6th Cir. 2020). Instead, he raises questions about the facts underlying the proffered nondiscriminatory reasons for his discharge. *See Majewski*, 274. F.3d at 1117. Because the emails, Fire Department letters, and testimony about the Hoffbeck event would allow a reasonable jury to determine that Defendant's proffered justifications were not "its actual motivation," Plaintiff met his burden at this step of the inquiry. *Wexler*, 317 F.3d at 578; *see also McDonnell Douglas Corp.*, 411 U.S. at 802–03.

was terminated." (*Id.* (citing Second Ulrich Decl., R. 65-1, Page ID # 747).) But the declaration that the district court itself cited shows that at least one other employee faced some version of termination; it states that Ken Duda "was offered a severance that was negotiated to assist him in an exit strategy." (Second Ulrich Decl., R. 65-1, Page ID # 747.) And in his deposition, Duda testified that he "was *fired* approximately thirteen months after Mr. Barry Regan took over as Senior Vice President of Global Operations," at the age of 66. (Duda Decl., R. 61-3, Page ID # 557–58 (emphasis added).) Duda added that his and other contemporaneous terminations "reduced the average employee age in Global Operations from the low 50's to low 40's." (*Id.* at Page ID # 559.) Given this evidence, a jury should decide whether WMT engaged in a pattern of age discrimination under Regan's leadership. As Plaintiff argues, "even small statistical samples can nevertheless serve as circumstantial evidence making discrimination more likely." (Appellant's Br. 27 (citing *Scott v. Goodyear Tire & Rubber Co.*, 160 F.3d 1121, 1129 (6th Cir. 1998)).)

In this case, Plaintiff stated a prima facie case of age discrimination, and he also rebutted the alleged "legitimate, non-discriminatory reasons" provided by Defendant for the adverse employment action. *See supra* pp. 12–16; *White*, 533 F.3d at 391; *see also Brewer*, 564 F. App'x at 642 ("[T]o survive summary judgment a plaintiff need only produce enough evidence to support a prima facie case and to rebut, but not to disprove the defendant's proffered rationale.") (quoting *Blair*, 505 F.3d at 532). In addition, Plaintiff provided evidence suggesting a more extensive pattern of age-based terminations at WMT that remains in dispute. Because a reasonable jury could find that the record supports Plaintiff's age discrimination claims, the district court erred when it granted Defendant's motion for summary judgment.

## CONCLUSION

For the reasons stated above, we **REVERSE** the district court's order granting Defendant's motion for summary judgment and **REMAND** the case for further proceedings consistent with this Court's opinion.

THAPAR, Circuit Judge, concurring in part and concurring in the judgment. Bud Courtney presented evidence that Wright Medical Technology's stated reasons for firing him are pretext for age discrimination. That's enough to send his claims to a jury. The majority goes a step further—it also finds Courtney offered evidence that Wright Medical's reasons lack a factual basis. I disagree, so I concur in all but Part II.B of the majority opinion.

Our precedent outlines three specific ways Courtney can show Wright Medical's stated reasons are pretextual. First, he can show that the reasons have no basis in fact. Second, he can show that they did not actually motivate his firing. And third, he can show that the reasons weren't sufficient to warrant firing him. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 (6th Cir. 2008). Courtney may also present independent evidence of pretext that falls outside these three buckets. *See Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 895 (6th Cir. 2020); *White*, 533 F.3d at 393. Our task is to evaluate whether, based on all the evidence, a reasonable jury could find Wright Medical's reasons are pretext for age discrimination.

The majority missteps as to the first bucket: showing Wright Medical's reasons have no basis in fact. To overcome summary judgment on this ground, Courtney must rebut the *factual* bases of the incidents Wright Medical identifies as reasons for firing him. *See Miles*, 946 F.3d at 889–90. In other words, he must provide evidence that some part of the incident didn't happen the way Wright Medical says it did—like if the company fired Courtney for tardiness when his timesheets showed he was early every day. *Id.* And even if it misunderstood the facts, Wright Medical can fall back on an honest belief in its account. *See id.* at 890 n.5. In this way, courts are

18

tasked with evaluating the facts underlying the employer's decision—not the employer's interpretation of those facts.

Here, Courtney hasn't shown that Wright Medical's reasons lack a factual basis. Indeed, he concedes the core facts of each incident. Rather than disproving their factual bases, he offers alternative interpretations he says a jury could find more persuasive than Wright Medical's. But Wright Medical is entitled to its own interpretation of the facts and its own judgment as to what warrants firing. So Courtney hasn't met his burden.

Start with Courtney's email exchange with Regan about the sprinkler system. The emails are in evidence—no one disputes what they say. Courtney doesn't claim that the emails are doctored or that important context is missing. Rather, he argues that Wright Medical's interpretation of the emails—that Courtney didn't provide the explanation Regan asked for—isn't the best interpretation. He says a jury could read the emails and find that Courtney did in fact provide everything requested of him. But this cannot show that Wright Medical's reason (the emails) has no basis in fact. Instead, it suggests that Wright Medical's interpretation of the emails was unreasonable. That's not one of the buckets our precedent outlines to establish pretext. Indeed, Wright Medical is entitled to draw its own conclusions from the facts. If Regan thought the emails weren't responsive, that's his prerogative. *See id.* at 890 (noting the employer's decision to fire the plaintiff "may be unwise, but that's not the question here").[1]

Next, the letters Wright Medical received from the fire department. Courtney contends that the letters don't support Wright Medical's conclusion that Courtney "went to the Arlington

---

[1] The majority also suggests that Courtney has shown the email exchange was an insufficient reason to fire him. *See* Maj. Op. 12. But to show it was insufficient, Courtney must introduce evidence that a similarly situated employee outside of his age group wouldn't have been fired. *See Miles*, 946 F.3d at 893. Courtney has introduced no evidence about other employees' treatment here.

19

Fire Department and clearly disparaged Mr. Regan." R. 53-1, Pg. ID 147. But again, the content of the letters is undisputed—copies are in the record, and Courtney doesn't claim they're inaccurate. To be sure, the fire department's letters don't specify that Courtney spoke with the firemen. *See* R. 56, Pg. ID 398 (noting they were contacted "by several representatives of Wright Medical"). But Courtney admitted he contacted the fire department. And soon after, the fire department sent Wright Medical a letter offering to "meet with the Manager that is so upset" about in-rack sprinklers. *Id.* So there is a factual basis for Wright Medical to conclude that Courtney's visit to the department was why the department sent the letter. *See Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 397–98 (6th Cir. 2008). And Courtney doesn't dispute that factual basis—he only suggests Wright Medical's conclusion was unreasonable. But that's beside the point. Wright Medical is entitled to act unreasonably so long as its reasoning is nondiscriminatory and based in fact. And here, its reasoning was. From there, it was Wright Medical's call to determine that a conversation conveying that management was "upset" was disparaging and inappropriate—and thus a legitimate reason to fire Courtney.

The majority points out that a jury could conclude Courtney went to the fire department to "thoroughly answer Regan's questions" rather than to disparage him. Maj. Op. 13. But again, a plausible alternative isn't enough to show Wright Medical's reasons have no basis in fact. And Courtney offered no evidence to suggest Wright Medical didn't have an "honest belief" that Courtney disparaged Regan. *Allen*, 545 F.3d at 398. Between the letters and Courtney's admission that he went to the fire department, Wright Medical had a factual basis to suspect Courtney had been less than complimentary during his visit.

Same goes for Courtney's interaction with Jason Hoffbeck. Courtney says the facts don't support Wright Medical's corporate representative calling it a "workplace violence" incident,

R. 55-6, Pg. ID 349, because Hoffbeck said that the confrontation wasn't "violent," R. 61-6, Pg. ID 638. But Courtney offered no evidence to rebut the factual basis for that conclusion—both he and Wright Medical believe that Courtney told Hoffbeck his performance in the meeting is "a good way to get your a** kicked" and warned him that in the South, they would "circle you up and beat you down" for behaving that way. *Id.* at 637. As the district court noted, Wright Medical based its decision to fire Courtney on those facts—not any particular label assigned to them. And Wright Medical was entitled to use its "honest business judgment" as to whether telling a coworker that clients would "kick his a**" warranted firing. *See Majewski v. Auto. Data Proc., Inc.*, 274 F.3d 1106, 1116–17 (6th Cir. 2001). Since Courtney hasn't presented evidence that the altercation with Hoffbeck never happened, he hasn't shown that this reason isn't based in fact.

Yet Courtney's claim still makes it to a jury. Why? Because he offered additional evidence (outside the three specific pathways) that suggests pretext. As the majority notes, Courtney put forth evidence that Wright Medical had a record of firing employees who were older than forty. And while Wright Medical contests that evidence, a dispute between dueling declarations is a quintessential credibility question—squarely in the jury's wheelhouse. Together with Regan's biography, which advertised his experience "replac[ing] . . . senior and middle leadership" and starting a "leading graduate development program," a reasonable jury could find pretext for age discrimination. R. 61-2, Pg. ID 555.

It's not a court's role to second-guess employers' determinations of what is responsive or proper workplace etiquette. Courtney asks us to do just that, albeit under the guise of "factual disputes." But he does not actually dispute the factual basis of Wright Medical's reasons for firing him. Rather, he offers only alternative interpretations of uncontested facts. And Courtney can't get to trial by merely suggesting that a jury could part ways with Wright Medical and find his

performance was up to par.  For if that alone were enough, courts would risk trampling employers' control over personnel decisions.

Even so, Courtney points to evidence of pretext beyond the reasons Wright Medical gave. So I concur in part and concur in the judgment.